MARTI TELFORD
H. TELFORD
718 HWY 82 E. #120
SHERMAN, TEXAS 75090

FILED
JUN 02 2010
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS, WACO DIVISION**

MARTI TELFORD, HOLLI TELFORD AND CINDY CHRISTENSEN :

Plaintiffs :

ERIC LYON, KEVIN MCDONOUGH, UTAH AND IDAHO DEPARTMENTS OF TRANSPORTATION; COSMO CLARK; MARK OLSON; OLSON AND ASSOCIATES; NAR INC., OLYMPUS DENTAL; CLAUDIA LAYCOCK; RICHARD TALLMAN, CHRISTINE DURHAM, DEE BENSON in their official capacities; LANCE: EDWARDS and SUPERVISOR ROUERK, IN THEIR OFFICIAL AND AND PERSONAL CAPACITIES; KEVIN WEST; MARY ANN HANSEN; IDOT; THE LAW OFFICES OF HALL, FARLEY, OBERRECHT & BLANTON P.A., LAW OFFICES OF STRONG AND HANNI; STEPHEN TRAYNER; HEBER THOMPSON in his official capacity as mayor of American Fork City and successor in interest JAMES HADFIELD in his official capacity, AMERICAN FORK CITY; MID AMERICAN ENERGY aka PACIFICORP; DOE BOP CUSTODIAL AGENT: FOR FMC @ CARSWELL; US ATTORNEY GENERAL ERIC HOLDER in his official capacity; CRAIG CHRISTENSEN and CHARTERED; USA BRUCE OLIVER; FIRST AMERICAN CORP, and DOES 1-20 inclusive

Defendants :

**VERIFIED COMPLAINT**

**DEMAND FOR JURY TRIAL**

W10CA154

---

COMES NOW MARTI TELFORD and HOLLI TELFORD and alleges as

follows:

## SUBJECT MATTER MATTER JURISDICTION ALLEGATIONS

1. This Court has subject matter jurisdiction over the within claims under the Federal Torts Claims Act hereinafter referred to as the "FTCA" 1, (28 USC section 1326, et seq.); Bivens constitutional torts 2; The Declaratory Judgment Act, 28 USC

---

1. See Fort Vancouver Plywood Co. v. US, 747 F.2d 547(9 th Cir. 1984) (A claim for Tortious Interference with a contract is actionable under the FTCA.); Accord Walsh v. US, 672 F.2d 746 (9th Cir. 1982); ***Chandler v. United States*, 875 F. Supp. 1250, 1266 (N.D. Tex Tex.1994)** (holding that allegations based on bringing charges without probable cause are actionable under the FTCA.); Moreover, the tort of Intentional infliction of emotional distress is not on the list of excluded torts under section 2680(a) of the FTCA and therefore is not barred by that provision. See Estate of Trentadue ex rel. v. United States, 397 F.3d 840, 854-55 (10th Cir. 2005); Sabow v. United States, 93 F.3d 1445, 1457 (9th Cir. 1996); Truman v. United States, 26 F.3d 592, 595 (5th Cir. 1994); Santiago-Ramírez, 984 F.2d at 20; Kohn v. United States, 680 F.2d 922, 926 (2d Cir. 1982); Gross v.United States, 676 F.2d 295, 304 (8th Cir. 1982). Malfeasance that postdates the initiation of plaintiff's criminal prosecution establishes as a matter of law, a claim for intentional infliction of emotional and mental distress. Moreover, if the misconduct would not have occurred outside of the FBI's aid, the United States will be held liable. See Wagenmann, 829 F.2d at 214; and Limone , 497 F. Supp. 2d at 227.

2. The defendants violated Holli's 1st, 4th, 5th and 6th and 14th amendment rights and Marti's 1st , 5th and 14th amendment rights. See Lusby v. T. G. & Y. Stores, Inc., 749 F.2d 1423, 1431 (10th Cir. 1984) (Private parties or public officials who use criminal complaints to coerce a release of civil liabilities from injured persons violated the constitution.) A person induces another person to institute criminal proceedings when he transmits untruthful information to an official and this action results in a criminal proceeding brought against the accused. See, e.g., Ziemba v. Fo'cs'le, Inc., 475 N.E.2d 1223, 1226 (Mass. App. Ct. 1985). A federal officer may be held liable for a wrongful prosecution if he acts as a complaining witness or **knowingly signs process containing false statements.** Restatement (Second) of Torts § 655 (1977)). A defendant procures a prosecution when the defendant provides information which he knows is false and which results in a grand jury indictment. See Torres v. Gsc Enterprises, Inc., 242 S.W.3d 553 (Tex. App., 2007). King v. Graham, 126 S.W.3d 75, 76 (Tex.2003); Browning-Ferris Industries, Inc. v. Lieck, 881 S.W.2d 288, 293 (Tex.1994); Jones v. Schein, 103 N.E. 57, 58 (Mass. 1913); and Tangney, 39 N.E. at 800. A defendant is liable for malicious prosecution if he took some active part in instigating or encouraging the prosecution. W.P. Keeton, Prosser & Keeton on the Law of Torts Sec. 119 (5th ed. 1984) (citing Wood v. Palmer Ford, Inc., 47 Md.App. 692, 425 A.2d 671 (1981)); Schleicher v. Western State Bank, 314 N.W.2d 293 (N.D.1982). Finally, see also Dugan v. Rank, 372 U.S. 609, 620 (1963). Oladipupo v. Austin, 104 F.Supp.2d 623, 624 (W.D. La. 2000) (a suit against a federal officer in his official capacity is permitted if (1) the government officer's powers in his official capacity are limited by statute and his actions were ultra vires, or (2) the officer was acting unconstitutionally pursuant to some other rule of law citing Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689-90 (1949)).

sections 2201 and 2202; The Diversity Statute 3; The Federal Civil Rights Act 4;

---

3. **Vulcan Materials Company v. the City of Tehuacana 238 F.3d 382 (5th Cir. 2001, Texas)** (Citing Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 105 S.Ct. 3108, 3119 (1985) holding that a federal takings claim ripens when just compensation is denied through state procedures, or when those procedures are either unavailable or inadequate. Id. at 3120-22. Furthermore, we hold that a plaintiff may bring a state law takings claim in federal district court if the traditional requirements for diversity jurisdiction are fulfilled.). See also Tenth Circuit holding that a plaintiff may remove a state law takings claim to the federal court if diversity jurisdiction exists. SK Finance SA v. La Plata County, Board of County Commissioners, 126 F.3d 1272, 1276 (10th Cir. 1997)).

4. See **First English Evangelica Lutheran Church v. County of Los Angeles,** 482 US 304, 315-16, 107 S Ct 2378, 2385-86, 96 L.Ed.2d 250(1987)(The Constitution requires states to waive sovereign immunity for the takings of property without just compensation for public use). "There is no immunity enjoyed by a government entity when the tort involved is impairment of a contract." See *Mount Pleasant* v. *Beckwith*, 100 U. S. 514 (1918) (The remedies for the enforcement of obligations assumed by a government entity through a contract, must be left unimpaired by the legislature or successor parties, otherwise the Constitution is violated through the impairment of contracts clause.). See also Stone v. Old Bridge Tp., 521 A.2d 1329, 215 N.J.Super. 361 (N.J. Super. A.D., 1987) (A common-law rule of assumption of contract liabilities by successor at law "extends to any contract so as to require the contract's continuance after alienation or dissolution...." McQuillin, Municipal Corporations § 8.17 at 596 (3d ed. 1979 & Supp.1985). Gober v. Pemberton Tp.,185 N.J. Super. 323, 335, 488 A.2d 516 (Law Div.1982); Board of Ed. of Voc. School v. Finne, 88 N.J.Super. 91, 105, 210 A.2d 794 (Law Div.1965); and see City of Groves v. Ponder, 303 S.W.2d 485 (Tex.Civ.App.1957); Fisher v. City of Mechanicville, 225 N.Y. 210, 121 N.E. 764. See also **City of Decatur v. Thames Bank & Trust Co., 84 F.2d 105 (5th Cir., 1936)** (article 1, § 10, of the Constitution of the United States provides that no state shall pass any law impairing the obligations of contracts. Any effort by a state agent to impair the obligations attendant to a contract are pre-empted by the impairment clause.); **Hood v. City of Birmingham, 562 So.2d 164 (Ala., 1990)** ("The impairment of contracts clause precluded the City as the successor in interest on the property from avoiding liability under the terms of the agreement assumed by operation of law." Here, the agreement was supported by the necessary consideration because it was based upon a pre-existing debt owed by the government entity as well as yet to be performed promises; the City as successor was liable on the agreement.) Williams v. Killen, 36 Ala.App. 446, 57 So.2d 828, 830 (1952), quoting 17 C.J.S. Contracts § 122, p. 850. Finally, see *People ex rel. Dept. of Transportation v. Acosta* (2009) 178 Cal.App.4th 762 (in eminent domain cases involving contract breaches, the condemnee may recover for loss of goodwill in honoring contract provisions attaching to the property sought to be condemned). Accord in Department of Transp. v. PSC Resources, Inc., 419 A.2d 1151, 175 N.J.Super. 447 (N.J. Super.L., 1974). See also ***United States v. Bestfoods*, 524 U.S. 51 (1998)** (held: successor liability will be enforced if there is a fraudulent attempt to avoid liability by transferring assets.) In **Lodestar Co. v. County of Mono, 639 F.Supp. 1439 (E.D. Cal., 1986),** the federal courts addressed the issue of a takings claim against a successor at law. Here, plaintiffs sought to impose liability on the Town relative to the federal constitutional claims, asserting the Town was a successor to the County and Supreme Court rule held that "Any law which leaves no adequate means for the payment of debts is forbidden by the Constitution."

RICO 5; and under the Fair Housing Act vis-a-vis abusing their condemnation authority in

---

Moreover City, County and state officials can be sued under the Civil rights act for patterns of discrimination by a government entity in spite of intervening change in officers or the government agency. See *Port of Mobile v. Watson,* 116 U.S. 289, 305, 6 S.Ct. 398, 405, 29 L.Ed. 620 (1886) (Where there have been prior patterns of discrimination by a government entity followed by an intervening change in the government entity, continuing the practices of the predecessor subjects the successor to liability.) Same in *Spomer v. Littleton,* 414 U.S. 514, 520-22, 94 S.Ct. 685, 688-89, 38 L.Ed.2d 694 (1974) (relief against a successor under section 1983 is appropriate when the factfinder makes factual findings that the successor will continue the predecessor's practices.) See Hand v. Gary, 838 F.2d 1420 (5th Cir. 1988, TX) (Using a criminal prosecution of the plaintiff as leverage in a civil suit proves a constitutional violation.) See also **Slavin v. Curry, 574 F.2d 1256 (C.A.5 (Tex.), 1978)** (Even though Judge Lindsey is immune from an action for damages, he would not be immune from an action for equitable relief. See Wood v. Strickland, 420 U.S. 308, 315 n. 6, 95 S.Ct. 992, 997 n. 6, 43 L.Ed.2d 214 (1975); United States v. McLeod, 385 F.2d 734, 738 n. 3 (5th Cir. 1967). Shipp v. Todd, 568 F.2d 133, 134 (9th Cir. 1978); Timmerman v. Brown,528 F.2d 811, 812, 813-14 (4th Cir. 1975); Hansen v. Ahlgrimm, 520 F.2d 768, 769 (7th Cir. 1975); Jacobson v. Schaefer, 441 F.2d 127, 130 (7th Cir. 1971); Nicholson v. Board of Commissioners of Alabama State Bar Association,338 F.Supp. 48, 52 n. 4 (M.D.Ala.1972); thus the district court errored in granting judge Lindsay judicial immunity from a suit for declaratory relief involving Judge Lindsay's instruction to the court reporter to alter the trial transcript in favor of the prosecution. Also such conduct was not immuned from criminal prosecution.)

5. See **Living Designs Inc. v. E.I. DuPont De Nemours, 431 F.3d 353 (9th Cir. 2003)** (Litigation misconduct is not immuned from a RICO prosecution. Fraud under the mail fraud and obstruction of justice statutes is established when opposing counsel omits information or fabricates documents to obstruct an official proceeding. )See too **Clark v. Stipe lawfirm, 320 F.Supp.2d 1207 (W.D. OK 2004)** (each proceeding obstructed by the defendant in an overall scheme constitutes a separate act of obstruction of justice.). Also see **Deck v. Engineered Laminates,** 349 F.3d 1253 (10th Cir. 2003)(each act of fraud which results in dismissal of a cause of action is remedial under RICO through the mail fraud statute.); **GI Goldings v. Baron & Budd, 238 F.Supp.2d 521 (S.D.N.Y. 2002)** ("Fixing" evidence, supplying false affidavits, backdating court documents, and falsifying court records to procure settlement of claims states mail fraud, wire fraud and obstruction of justice claims.); Followed in Lockheed Martin v. Boeing, 357 F.Supp.2d 1350 (M.D.Fla 2005) (Giving perjurious testimony, filing false affidavits and destroying evidence favorable to the opposing party, is actionable as mail fraud, wire fraud, witness tampering and obstruction of justice); US v. Triumph Capitol Group, Inc., 260 F.Supp.2d 462 (D.Conn.2002) (corruption of the grand jury process through perjury and submission of false documents actionable under RICO.), and; U.S. v. Cianci, 210 F.Supp.2d 71 (R.I. 2002) (Associated in fact enterprises can include government officials. These official's immunities will be judged under the same standard as immunities under civil rights act). See Lusby v. T. G. & Y. Stores, Inc., 749 F.2d 1423, 1431 (10th Cir. 1984) (Private parties or public officials who use criminal complaints to coerce a release of civil liabilities from injured persons constitutes a form of extortion which may be remedial through RICO if plaintiff can establish predicate acts leading to the probable cause determination which are not protected by any immunities), and; Gillmor v. Thompson, 490 F.3d 791, 799 (10th Cir. 2007) ("Congress meant to punish as extortion any effort to obtain

a retaliatory manner 6 and because UDOT and IDOT accepted federal funds for road development and injured plaintiffs in the illegal exercise of those development

---

property, by inherently wrongful means, such as force or threats of force, or criminal prosecution.)

6. See **White v. Lee, 227 F.3d 1214 (9th Cir., 2000)** (following the standard under **Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731 (1983)**, the 9th circuit affirmed that HUD officials used administrative procedures and a state lawsuit as a an instrument of coercion and retaliation in violation of the 1st amendment when HUD filed a state action which lacked a reasonable basis in fact and law and was filed to penalize the defendants for exercising their rights to petition. In Bill Johnson's, a waitress filed unfair labor practice charges with the National Labor Relations Board (NLRB), alleging that she had been fired for her efforts to organize a union. 461 U.S. at 733. The restaurant sued her in state court, alleging that while picketing she had harassed customers, blocked access to the restaurant, threatened public safety, and libeled the restaurant in her leaflets. Id. at 734. The waitress then filed a second charge with the NLRB, alleging that the restaurant had violated 29 U.S.C. 158(a)(1) of the National Labor Relations Act (NLRA), which makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights" guaranteed under that act. See 461 U.S. at 734-35. The NLRB opined that the restaurant's lawsuit was used to coerce, retaliate and penalize the waitress for engaging in protected activity. The Board found that the lawsuit lacked a reasonable basis in law and it ordered the restaurant to withdraw its state-court complaint and undertake a number of additional remedial measures. Id. At 737.) See also *United States v. Williams*, 553 U.S. 285, __ (2008) ("...fraud is a separate category of speech which independently lacks First Amendment protection.). Accord in **Evans v. County of Custer, 745 F.2d 1196, 1204 (9th Cir. 1984. Idaho)** ("the first amendment's protection of the right to petition the government for redress of grievances" encompasses the right of homeowners to challenge such property-related decisions by local government such as road access rules. A property owner's right to exclude others from their property is "universally held to be a fundamental property right." Kaiser Aetna v. United States, 444 U.S. 164, 179-80, 100 S.Ct. 383, 392-93, 62 L.Ed.2d 332 (1979). **California Motor Transp., 404 U.S. at 511 (1971)** (where suit is filed for merely sham purposes, the suit can be enjoined as a baseless lawsuit with the intent of retaliating against the plaintiff. The judge has a duty to determine whether plaintiff's suit is objectively baseless, and if so, discontinuing the suit.); Accord in **Tichinin v. City of Morgan Hill, H031019 (Cal. App. 2009) Hartman v. Moore, 126 S. Ct. 1695, 547 U.S. 250 (S.Ct., 2006)** (upon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate his action was not motivated by retaliation nor was it baseless.). Also see **Rodriguez v. Rutter, No. 07-51423 (5th. Cir. 2/9/2009) (5th. Cir., 2009)** ( "Any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." Izen v. Catalina, 398 F.3d 363, 367 **n.5 (5th Cir. 2005)** (quoting Smith v.Plati, 258 F.3d 1167, 1176 (10th Cir. 2001) (citations omitted)). To make out a First Amendment retaliation claim, plaintiff must show: (1) he was engaged in constitutionally protected activity; (2) the official's actions caused him to suffer an injury, and (3) the official's actions were substantially motivated against plaintiff's exercise of constitutionally-protected activity.

activities. 7 Plaintiff HOLLI has also stated claims for backwards denial of access under the First Amendment and Harbury supra, in that HOLLI lost the prior prosecutions for reasons other than on the merits because of corruption of the office of Richard Tallman who owned substantial stock interests in the complaining witnesses's companies. This record will show that TALLMAN advanced the private party complaining witnesses' corrupt legal agenda to extort HOLLI, MARTI and CHRISTENSEN without just cause and when HOLLI complained, TALLMAN corruptly used his office to initiate and procure HOLLI"S baseless criminal prosecution in re USDC case no. 2:07 CR 272.

2. This Court also has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 USC section 1367 for abuse of process, malicious prosecution, intentional infliction of emotional and mental distress, unclean hands, conversion, trespass, and bills of review in equity.

## 1st COA: JURISDICTION AND VENUE UNDER THE FTCA

3. The FTCA Plaintiffs presently reside in the state of Texas.

4. Of the claims herein brought, the First claim is against the United States pursuant to the Federal Tort Claims Act (28 U.S.C. §2671, *et seq.*) and 28 U.S.C. §§1346(b)(1), for money damages as compensation for loss of property and personal injuries that were caused by the negligent and wrongful acts and omissions of employees of the United States Government while acting within the scope of their offices and employment, under circumstances where the United States, if a private person, would be liable to the Plaintiffs in accordance with the laws of the States of Texas, Idaho and Utah.

---

7. See 28 CFR Part 35, section 14.414 Non-Discrimination by Public Entities proscribed by Executive Order 12259 of Dec. 31, 1980, 46 FR 1253, 3 CFR, 1980 Comp., p. 307, outlawing discrimination by public entities because of race, color, religion (creed), sex, national origin or disability... (a) in the sale, leasing, rental, or other disposition of residential property and related facilities (including land to be developed for residential use), or in the use or occupancy thereof, if development of such property for residential use is effected by loans, advances, grants, or contributions agreed to be made by the Federal Government, or (iv) the property is obtained from a State or local public agency receiving federal assistance, and plaintiff assists in improving the property for slum clearance to the benefit of the public.

5. Venue is proper in Texas because all or a substantial part of the acts and omissions forming the basis of the underlying FTCA claim occurred in the Northern District of Texas.

6. The defendants are liable to plaintiffs for the excepted torts of (a) malicious prosecution as it pertains to the dismissed criminal action: U.S. v. Holli Lundahl, case no. 2:07 CR 272; (b) abuse of process to bring about the illegal defeat of HOLLI's prior actions; (c) tortious interference with prospective economic advantages; and (d) intentional infliction of emotional and mental distress.

7. Plaintiff has fully complied with the provisions of 28 U.S.C. § 2675 of the Federal Tort Claims Act.

8. This suit has been timely filed, in that Plaintiffs timely served notice of her claims upon the Department of Justice and the BOP in 2008 and again in 2009. The U.S. Department of Justice assumed responsibility for processing the claims on behalf of all respective agencies. The DOJ verified receipt of HOLLI's administrative claims by email of DOJ employee but has not formally denied HOLLI's claims.

9. The employees committing the torts against HOLLI are and were "investigative or law enforcement officers", or acting as such, within the meaning of 28 U.S.C. §2680(h), and the pursued torts have been excepted for liability under 28 U.S.C. §2680(b).

## 2nd COA: JURSIDICTION UNDER BIVENS CONSTITUTIONAL TORTS

10. The defendants are liable to HOLLI and MARTI under Bivens Constitutional Torts for acts which took place in the states of Texas, Idaho and Utah.

11. The federal defendants while acting under color of law did violate and **conspire with private party defendants to violate** HOLLI's First, Fourth, Fifth and Sixth Amendment Rights to be free from deprivation of life, liberty or property without due process of law; to be free from an untainted retaliatory and expeditious criminal trial; and to choose her own counsel to defend against the retaliatory criminal prosecution. The defendants also caused profound and malicious damages to HOLLI justifying punitive damages.

12. The defendants also violated HOLLI and MARTI's first amendment rights to petition the government for redress of grievances - through false and corrupt criminal contempt judgments issued by TALLMAN, BENSON and DURHAM which were entered without jurisdiction and in violation of the Due Process Clause of the Constitution. Furthermore, TALLMAN's contempt order acted as probable cause process synonymous to a criminal complaint or indictment and was used as primary evidence by FBI officer SORENSON for the charges alleged in the 5/2/07 indictment underlying criminal case number USDC- Utah case no, 2:07 CR 272. 8 As such, HOLLI maintains that TALLMAN's contempt judgment set forth the complaining witnesses responsible for the initiation of criminal case no. 2:07 CR 272.

13. HOLLI and MARTI also petition for Larson Dugan and declaratory relief against TALLMAN, BENSON, DURHAM and WINMILL's criminal/civil contempt judgments as void as a matter of law thus requiring immediate vacation of these orders which continue to harm HOLLI and MARTI and anyone equally situated. Tallman's order is found at exhibit "23" attached, and page 5 of this order specifically identifies all of the crimes TALLMAN accused HOLLI of committing pursuant to criminal complaints filed by private party complaining witnesses from April 28, 2006 to May 15, 2006 and for which HOLLI was exonerated in 2009 upon dismissal of criminal case no. 2:07 CR 272. Also, Benson's contempt order is found at exhibit "20" attached, Durhams' contempt order is found at exhibit "14" attached, and Winmill's contempt order is found in exhibit "33" attached and all are inherently void and invalidly layered upon each other. All contempt judgments were responsible for keeping HOLLI, who has no recorded criminal record whatsoever, detained in jail as pretrial

---

8. A vindictive prosecution is shown by evidence that the action was brought for unjustifiable reasons resulting from the defendant's exercise of a protected legal right." ***United States v. Goodwin*, 457 U.S. 368, 380-81 (1982)** (There is a constitutional right to be free of "bad faith prosecutions."). ***Mondragon v. Thompson*, 519 F.3d 1078, 1083 (10th Cir. 2008)** ("Knowingly arresting a defendant without probable cause, leading to the defendant's subsequent confinement and prosecution, violates the Fourth Amendment's proscription against unreasonable searches and seizures. *E.g. Meacham,* 82 F.3d at 1561 (citing *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). **Wilkins v. DeReyes, 528 F.3d 790 (10th Cir., 2008)** ("The initial seizure is governed by the Fourth Amendment, but at some point after arrest, constitutional analysis shifts to the Due Process Clause." )

detainee for over 2 years under the theory that HOLLI was a danger to the public at large because HOLLI sues for extorting tort defendants for constitutional wrongs.

14. HOLLI also alleges 4th, 5th and 6th amendment violations with respect to the unauthorized taking of 2 acres of Holli's real property without just compensation by IDOT and DOES officials, and the gutting of HOLLI's home by the misconduct of EDWARDS and other FBI officers; all while HOLLI was in jail as a pretrial detainee for more than 2 years and resulting in the alienation of that property at a significant loss.

15. MARTI and HOLLI further assert that all defendants conpsired with judges and clerks to the benefits of their clients, to fabricate false orders which corruptly represented that: (a) MARTI and HOLLI were the same persons, (b) that HOLLI did not then have an Idaho residence address; (c) that HOLLI did not serve West with copies of pleadings relevant to USDC-Idaho case no. 05-CV-460 when HOLLI's phone bill was submitted to FBI agents who validated these faxed services; (d) that HOLLI committed service fraud and falsified service documents in Caffree v. Lundahl, 143 Fed.Appx.102 (10th Cir. 2005) and Los Angeles Homeowners Aid, Inc v. Lundahl, case no. 05-126 2005 WL 1140649 (D.Idaho 2005) when HOLLI was a defendant in those cases and not charged with service duties as a matter of law; (e) that HOLLI committed jurisdictional fraud with respect to First American Title Insurance and Barnes in Telford v. Brown, Idaho federal case no. 4:05 CV-460 - when these defendants filed general appearances in that case; a service videotape also filed with TALLMAN proved any service dispute in HOLLI's favor, and; HOLLI was discharged of any and all crimes concerning service fraud in HOLLI's 2007 criminal prosecution; (f) that HOLLI committed service fraud in LUNDAHL v. CNA Ins., case no. 20010845 2003 WL; an order entered by the Utah appellate court AFTER the case had been removed to the Bankruptcy court and the Utah appellate court was stripped of subject matter jurisdiction pertaining to that case. (See footnote 24 infra); Moreover there was no charge of service fraud ever made in that case; (f) that HOLLI committed service fraud in LUNDAHL v. Public Storage Mgmt Inc., when Public Storage's counsel never made any claim that Holli committed service fraud in that case and in fact made a general appearance in that matter and successfully obtained a dismissal without prejudice order "under the first to file rule" due to related litigation

pending in another forum; and (g) that HOLLI forged bank notary signatures by Gottfredson or Chavarin in the Idaho federal cases.

16. During the prosecution of the 2007 criminal case, the prosecutor moved to dismiss the entire criminal action after HOLLI filed a mandamus writ alleging prosecutorial misconduct for failure to provide any probable cause evidence that HOLLI committed any of the crimes alleged in Tallman's contempt judgment. 9

17. Plaintiffs sue HOLDER in his official capacity to exercise his supervisory authorities as provided in 28 U.S.C. §§ 519 and 533.3 to appoint officials to investigate into whether crimes committed by non-immuned officers of the court - specifically attorneys - in the prosecution of four cases raised in the illegal contempt judgment entered by judge TALLMAN on May 24, 2006 and which criminally obstructed justice in those Idaho federal cases, merit an order directing criminal prosecution by Holder himself in Washington DC to protect the integrity of the judicial process. The perjurious statements suborned by officers of the court in the Idaho federal cases and deliberately covered up by Judge TALLMAN are as follows:

**A. Lundahl v. Brown, USDC-Idaho # 2:05-CV-460:**

**(1) Fraud By Attorney For First American Title Insurance Company**

---

9. See **Wilkins v. DeReyes, 528 F.3d 790 (10th Cir., 2008)** ("The initial seizure is governed by the Fourth Amendment, but at some point after arrest, constitutional analysis shifts to the Due Process Clause." *Pierce v. Gilchrist,* 359 F.3d 1279, 1285-86 (10th Cir.2004). If the defendant has been imprisoned without legal process or based upon false process, the defendant has a claim under the Fourth Amendment. If the defendant has been imprisoned and continues to be imprisoned pursuant to legal but wrongful process, the defendant has a claim under the procedural component of the Fourteenth or Fifth Amendments's Due Process Clauses analogous to a tort claim for malicious prosecution. In State v. Rogovich, 188 Ariz. 38, 932 P.2d 794 (Ariz., 1997), the Court affirmed the principle that one who engages in reckless conduct that is actively instrumental in causing legal proceedings to be improperly maintained even if that conduct played no role in the initiation of the legal proceedings, is liable under section 1983. **Bigford v. Taylor, 834 F.2d 1213, 1218 (5th Cir.1988)** ("[P]olice may not disregard facts tending to dissipate probable cause and thereby continue a criminal prosecution against an accused"); Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir.1999) ("[B]ecause the totality of the circumstances determines the existence of probable cause, evidence that tends to negate the possibility that a suspect has committed a crime is relevant and must be presented once obtained). See also **Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)** (A subsequent tort jury is entitled to determine whether the withholding of exculpitory evidence to a grand jury would have negated the probable cause determination and nullified the continuation of criminal proceedings.)

First American Title Insurance Company's attorney Craig Christensen submitted the perjured affidavit of Monine Cole in USDC-Idaho federal case no. # 2:05-CV-460. Monine Cole provided the following attestments under oath which were established as false during the 2007 criminal prosecution of HOLLI:

(i) that no one served a summons and complaint re USDC-Idaho case no. # 2:05-cv-460 on any person in charge of First American Title Insurance Company's office in Meridian Idaho in November 2005.

(See filing made on April 5, 2006 labeled "Declaration of Holli Lundahl" which has attached as it's exhibit "1", a service videotape showing service of process on First American Title Insurance Company in Meridian Idaho and service of process on Beehive Credit Union in Salt Lake County, Utah; both in November of 2009). The FBI reviewed this service videotape for HOLLI's 2007 criminal prosecution and determined that the tape verified that service of process was indeed made on the person represented to be in charge of First American Title Insurance Company's Meridian, Idaho office on or about November 10, 2005.

**(ii)** that First American Title Insurance Company was permitted as a matter of law to challenge service issues AFTER First American Title Insurance Company made a general appearance on February 3, 2006. 10

(See exhibit "38" attached for First American Title Insurance Company's Notice of General Appearance); See also exhibit "40" attached for attacking authority.

**(iii)** that First American Title Company of Idaho, Inc. and other title companies in Idaho bearing "First American" in their names to include First American Administrative Services Inc., all merged under one corporate name in 2003, to wit: First American Title Company Inc. as shown by Ex. "39 attached; but that said mergers never resulted in a company called First American Title Insurance Company. Furthermore, Cole attested that "there is no legal entity known as First American Title Insurance Company" in Idaho.

---

10. See **Baker v. Monsanto Co., 77 S.W.3d 477 (Tex. App., 2002)** (Without service of citation or a waiver thereof, nothing short of a general appearance will confer upon the trial court jurisdiction over a person. *C.W. Bollinger Ins. Co. v. Fish,* 699 S.W.2d 645, 655 (Tex.App.-Austin 1985). Under Rule 120, a defendant may, in open court, enter an appearance, which has the same effect as if the citation had been duly issued and properly served by law. TEX.R. CIV. P. 120. (See exhibit "40" for Supreme Court decision which held that a general appearance made at the fraudulent inducement of opposing counsel nevertheless waived issues of jurisdiction.)

(See exhibit "39" attached for relevant part of Cole affidavit denying the existence of any entity named First American Title Insurance Company in Idaho and attaching a merger document supporting Cole's assertion that all "First American" Title companies merged in Idaho in 2003 to become First American Title Company Inc.) and;

(iv) that the sole director of merged First American Title Companies was Dwain Stufflebeam.

(Refer back to paragraph 24 of the Cole affidavit, ex. "39" attached, for this false attestment).

**On February 24, 2006, April 5, 2006 and again on April 17, 2006 as shown by the docket record attached hereto as exhibit "37", HOLLI filed official records showing that First American Title Insurance Company had committed blatent fraud upon the Idaho federal court. HOLLI presented the following exculpitory facts and self authenticating evidence to prove that Cole had committed perjury and that First American Title Insurance Company's attorney subjorned that perjury:**

(1) In response to Cole's assertion that Stufflebeam was the sole director for First American Title Company of Idaho, HOLLI presented the State of Idaho's Registered Agent and Officer Notification Form for First American Title Company of Idaho attached hereto as exhibit "41". This record showed Dwain Stufflebeam was a secretary and director for the Corporation; but that two other individuals Parker Kennedy and Tim Hartman were also directors. An internet search on these individuals showed that Parker Kennedy was the chairman of and grandson to the founder First American Corporation, the mother company of First American Title Insurance Company. See exhibit "42" attached for this internet search. An internet search on Tom Hartman showed that he was the Regional Vice President of operations for the Pacific Northwest for First American Title Insurance Company. See exhibit "43" attached for Internet publication on Tom Hartman. Accordingly Cole's assertion that Dwain Stufflebeam was the only director was false and constituted perjury which was suborned by Christensen.

(2) To attack Cole's perjurious statement that First American Title Insurance Company was not a legal entity, HOLLI filed the Agency records for the Department of Insurance for the state of Idaho. Under company Information, First American Title Insurance Company is said to reside at the same address as First American Corporation, its mother company and that 10 title companies in Idaho are the producers for First American Title Insurance Company including First American Title Company of Idaho, Inc. (See exhibit "44" for a copy of this official

publication found on Idaho state's official website.) HOLLI also presented the Idaho Dept. of Insurance's Agency Information report on First American Title Company of Idaho, Inc attached hereto as exhibit "45" and which showed that First American Title Company of Idaho only produced title insurance for one company to wit: First American Title Insurance Company.

(3) While HOLLI's 2007 criminal prosecution was pending in part on TALLMAN's criminal contempt order, a civil rights advocate obtaining evidence for HOLLI, presented the FBI with exhibit "46" attached which showed that First American Title Insurance Company was being prosecuted by numerous state Attorney Generals for mortgage and appraiser fraud. The State of Florida entered into a Settlement Agreement with First American Title Insurance Company, the later representing the interests of all of its producers/constituent title agencies, to pay $50 million in fines to the state of Florida to be placed in a fund to compensate the homeowners that First American Title Insurance Company and it's constituent producers defrauded. Exhibit "46" includes the caption page, the signature page of the agreement signed by Parker Kennedy, Florida Office of Insurance Regulation, Florida Dept. of Financial Services and HUD and a 2 page list of all of the producers/constituent title companies operating solely for First American Title Insurance Company.

**(2) Fraud By Judicial Officials On Behalf Of First American Title And Other Defendants**

**(i)** On April 7, 2006, TALLMAN issued an order to show cause against HOLLI why her claims against First American Title Officer Jeffrey Barnes should not be dismissed for alleged inconsistency in service of process upon Barnes. See exhibit "57" attached, last page.

**(ii)** Later that same same day HOLLI filed a response to TALLMAN's OSC which asserted that BARNES had made a general appearance on March 8, 2006 (See exhibit "47" attached for this general appearance), had therefore conceded to personal jurisdiction, and that there was a complete absence in the record of any pleading filed by BARNES contesting service of process on BARNES. At the same time, HOLLI filed a First Amended Complaint in another case (see exhibit "48" attached for caption page and jurisdiction page of this FAC file stamped by the Idaho clerk on April 7, 2006) and HOLLI had paid the court a filing fee in the form of a money

order in that Idaho case in order to remove the action from IFP status. (See exhibit "49" attached).

(iii) Judge TALLMAN instructed the clerk of the court to conceal HOLLI's filings made on April 7, 2006 pursuant to a scheme to obstruct all of Holli's Idaho federal cases. The Clerk did graft HOLLI's filings made in several cases and removed the docket entries on these filings from the PACER docket records; thus making it appear that HOLLI never made various filings in several of the Idaho cases.

(iv) Three months later, the clerk returned HOLLI's "grafted" filings because Judge TALLMAN executed an order precluding HOLLI from making any filings in the state of Idaho. The clerk returned Holli's filings with the cover letter found at exhibit "50" attached. Included among these returns was HOLLi's response to the court's OSC re Barnes. After HOLLI's 2007 criminal prosecution termed in HOLLI's favor in 2009, TALLMAN ordered the clerk to seal the clerk's letter found at exhibit "50" attached. Nevertheless, this letter was submitted to the FBI during HOLLI's 2007 criminal prosecution to prove that biased court officers were grafting court files, manipulating court dockets and concealing filings made by HOLLI.

(v) In June of 2006, Judge TALLMAN corruptly dismissed HOLLI's claims against BARNES falsely asserting that HOLLI failed to respond, when in fact HOLLI 's response was grafted from the court record by the clerk pursuant to TALLMAN's instruction because said grafting act carried the "civil" cloak of TALLMAN's personal immunity. See exhibit "51" attached for relevant part of TALLMAN's June 2006 order dismissing HOLLI's claims against BARNES for inadequate service based upon the false assertion that HOLLI failed to respond. HOLLI moves HOLDER to investigate in TALLMAN's orders which purported to authorize tampering with the court's records.

**(3) Fraud By Attorney Kevin West On Behalf Of The Beehive Defendants**

According to TALLMAN's 5/24/06 contempt judgment at exhibit "23" attached, pages 5-6, TALLMAN found credibility with the following criminal accusations made by Attorney Kevin West re USDC-Idaho case # 2:05-cv-127:

(i) HOLLI signed numerous certificates of service indicating service of pleadings on West - which were false. 11

**HOLLI'S RESPONSE:** HOLLI admitted that she served all defendants in USDC-Idaho case # 2:05-CV-460 by facsimile service. HOLLI provided the service affidavit of Marie Marchant attached hereto as exhibit "53" as proof that she served her filings on the opposing parties' attorneys including West, by facsimile as allowed under Idaho rules of procedure. HOLLI also admitted that her faxes were went sent from her toll free business line 877-870-5892. 12

HOLLI argued that 877 toll free lines operated under the same premise as long distance phone calls except that all charges for toll free calls were billed on a per minute basis to the owner of the 877 line. (See exhibit "54" attached for 800 line regulations by the FCC). Consequently, a phone bill containing per minute charges existed.

During HOLLI's 2007 criminal prosecution, the FBI received copies of the toll 877-line phone bill used by HOLLI and confirmed that service of process was indeed made upon West as certified in HOLLI's certificates of service.

**(ii)** WEST falsely accused HOLLI of being MARTI Telford and of not having a residence address in Idaho

West's affidavit found at exhibit "52" attached, paragraph 3, ADMITTED that the Beehive defendants obtained the license plate to the car HOLLI, MARTI and MARCHANT were driving the day these persons performed service of the **contempt**

---

11. TALLMAN disregarded Wests' claim that his clients were not served with the summons and complaint on November 9, 2006, but instead were served on February 1, 2006, because HOLLI's service videotape submitted to TALLMAN's court during the criminal contempt trial, had contained therein the McKay Events Center LED monument bordering the I-15 freeway in Orem Utah and which advertised the date of November 9, 2005 immediately after the Beehive defendants were served with the summons and complaint and immediately before Barry Brown of Orem, Utah was served with a summons and complaint. A picture of the LED monument is found in exhibit "55" attached. Moreover, Holli submitted a second videotape showing service of **contempt process** on the Beehive defendants on February 1, 2006 re the contempt matter HOLLI filed against the Beehive defendants. With two separate services featured, TALLMAN properly discredited Wests' false accusations with regards to service of the initiating summons and complaint. See relevant parts of West's criminal accusation as exhibit "52" attached, paragraph 4.

12. Moreover, it is interesting to note that Kent Higgins also recieved facsimile services on the same day as West and did not make any claims that he was not served pleadings by facsimile. Finally, West at the time he responded to HOLLI's opposing papers in the BROWN case never made any claims that he had not received HOLLI's process. Accordingly, the prosecutor did not find WEST's service fraud accusations credible either.

**process** on the Beehive defendants. The Beehive defendants illegally ran a make on the license plate without Marti Telford's permission and learned that the car was licensed in 2003 to Marti Telford (2 years earlier) at a Spanish Fork, Utah Address.

**HOLLI'S RESPONSE:** HOLLI presented the deeds to and pictures of her Idaho then residence (exhibits "22", "29" "56" and attached), her IDAHO ID and letter by her power company (Ex. "56" attached) and and a county recorder record establshing that the Spanish Fork address belonged to a Dave Pontious, to prove HOLLI's present residence status.

TALLMAN concealed these documents submitted to him during the criminal contempt trial to obstruct HOLLI's access to the Idaho courts and pursuant to a conspiracy with WEST for fraudulently charge HOLLI with service fraud.

**(4) Obstructed Disposition Of USDC-IDAHO Case No. 2:05-CV-460**

(i) TALLMAN ignored HOLLI's submitted evidence and dismissed USDC-Idaho case no. 05-CV-460, TELFORD v. BROWNS, et al, with prejudice based on lack of personal jurisdiction. (See relevant portion of TALLMAN's order as exhibit "57" attached and granting all defendants except BARNES motions to dismiss for lack of personal jurisdiction. The order falsely represents that HOLLI was required to oppose First American's "waived" motion to dismiss for lack of personal jurisdiction within 21 days. In fact the rule is 24 days if process is mailed. All process was mailed to HOLLI. HOLLI did oppose First American's motion on April 5, 2006 asserting a general appearance by First American on February 3, 2006. See Doc. no. 38. and exhibit "38" attached hereto for First American Title Insurance Company's general appearance.) It is contended by HOLLI that TALLMAN made this false ruling in order to corruptly bar HOLLI's access to the Idaho federal courts.

(ii) As stated supra, even though BARNES made a general appearance on March 8, 2006 and did not submit any filing challenging service of process, TALLMAN entered an order dismissing Holli's claims against BARNES based on non-existent service issues that were not of record (see exhibit "51" attached); after TALLMAN directed the clerk not to file HOLLI's objection tendered to the court on the afternoon of April 7, 2006. Refer back to ex. "50" attached for clerk's return of HOLLI's April 7, 2006 filings.

(iii) Holli filed a timely challenge to TALLMAN's contempt judgment in Idaho case # 05-CV-127 on August 3, 2006. HOLLI complained that TALLMAN failed to accord HOLLI the protection of criminal procedures and failed to provide HOLLI an impartial tribunal in defending against the false criminal accusations. (See exhibit "24" attached for HOLLI's filing). In lieu of this challenge, TALLMAN immediately submitted his criminal contempt judgment to federal authorities for prosecution. HOLLI was arrested two months later for the beginning of a series of criminal prosecutions that would be brought against HOLLI based on the complaining witnesses criminal accusations in TALLMAN's contempt judgment. All complaining witnesses in TALLMAN's contempt judgment and TALLMAN then secured HOLLI's pre-trial detainment in federal and state jails for more than three years in total - while these multiple criminal prosecutions were pursued against HOLLI. All of the appeals HOLLI paid for on the Idaho cases obstructed by the complaining witnesses and TALLMAN, were subsequently dismissed when the appellate courts refused to stay HOLLI's appeals in light of HOLLI's detention as a supermax inmate and HOLLI's failed access to any legal assets or communication with legal personnel during her three year pre-trial detention periods.

**(5) A Federal Criminal Prosecution Was Brought On TALLMAN's Contempt Judgment And Termed In HOLLI's Favor In 2009**

(i) As stated supra, federal authorities brought multiple criminal prosecutions against HOLLI based on the wholesale criminal accusations made in TALLMAN's criminal contempt Judgment. Specifically, ELI LILLY's attorneys brought a 2006 federal criminal prosecution against HOLLI; Los Angeles Homeowners Aid and the NAR defendants' attorneys brought a state 2006 criminal prosecution against HOLLI; and the BROWNS, COMPTONS, STRONG AND HANNI, and NAR defendants' attorneys brought a 2007 criminal prosecution against HOLLI. HOLLI won all of these criminal prosecutions either by a judgment finding HOLLI not guilty or by a dismissal of the actions by the sitting judge pursuant to the US prosecutors motions to dismiss for lack of material evidence that a crime had been

committed by HOLLI. See dismissal judgment in USDC-Utah case # 2:07-CR-272 as exhibit "27" attached hereto.

(ii) This action deals solely with the 2007 criminal prosecution brought against HOLLI as USDC-Utah case no. 2:07 CR 272, USA v. Holli Telford Lundahl. The prosecutor directly tendered TALLMAN's contempt judgment into the record for purposes of supplementing the perjury accusations initiating USA v. HOLLI TELFORD LUNDAHL, case # 2:07 CR 272; said perjury charges based on the substantive crimes of fabricating false evidence. Defendant FBI officer Lance Edwards aided the prosecution of that case having previously attempted to attack service of process made upon EDWARDS on October 31, 2000 in a summons and complaint wherein HOLLI sued EDWARDS for the malicious prosecution of grand jury proceeding no. C699. EDWARDS and other FBI officers attacked HOLLI while HOLLI was filming service of process on EDWARDS. (See exhibit "68" attached for EDWARDS admission of this attack on HOLLI while HOLLI was filming service of process - in the 302 FBI report filed in USDC-Utah case no. 2:07-CR-272. The 302 FBI report is followed by the grand jury subpeona EDWARDS served in 2000 and underlying HOLLI's complaint against EDWARDS. EDWARDS knew that HOLLI regularly videotaped her services of process given the overall general nature of attorneys to commit fraud by denying service of process. EDWARDS and Martin Schwartz seized Holli's videotape of that service and deleted the recording. An obstruction charge was filed against EDWARDS with the Office of Professional Responsibility in 2003. To defray that accusation, EDWARDS retaliated against HOLLI by combining with TALLMAN and other court officers to charge HOLLI with service fraud in the Idaho litigations.).

(iii) Nevertheless, at the outset of the 2007 criminal prosecution, Holli's residence status was placed at issue when HOLLI sought pre-trial release. MARTI personally met with HOLLI's appointed public defender Robert Steele and tendered evidence that proved MARTI was not HOLLI and that HOLLI resided at the Idaho address. (In fact, HOLLI was arrested at her Idaho home when LILLY began the 2006 criminal prosecution.). The prosecutor conceded that HOLLI resided at

the Idaho address and that MARTI was not HOLLI. Accordingly, the prosecutor procured HOLLI's pre-trial detention based on the complaining witnesses statements memorialized in TALLMAN's criminal contempt judgment and which falsely asserted that HOLLI engaged in falsification of evidence 13. The prosecutor argued that HOLLI would likely witness tamper during her criminal prosecutions and that this potential was a reason to keep HOLLI detained pending trial. The biased Criminal Judge agreed.

(iv) The prosecutor produced more than 6,038 pages of discovery documents comprised of every record published in the lawsuits raised in Tallman's, Benson's and the Utah Supreme Court's contempt judgments. After receipt of this discovery, HOLLI filed with the Court her legal briefs which attacked the legal merits of these contempt judgments. (See exhibits "15", "19" and "24" attached for these submitted legal attacks). HOLLI also provided exculpitory evidence to the prosecutor attacking every false accusation made in these contempt orders vis-a-vis civil rights advocates aiding HOLLI.

(v) After receiving exculpitory evidence from civil rights advocates interested in HOLLI's cases, the prosecutor concluded with respect to IDAHO federal case # 2:05-CV-460, Telford v. Browns, et al.: that: (1) HOLLI did have a residence in IDAHO; (2) HOLLI and MARTI were separate people; (3) HOLLI conducted interstate business out of Idaho; (4) HOLLI had a toll free phone number which she used to serve process by facsimile on tort defendant's attorneys; (5) HOLLI's proofs of services certifying facsimile service of filings on Attorney West were correct and accurate; (6) HOLLI's service videotapes confirmed that HOLLI did indeed effect proper service process on all of the defendants in the Brown case; (6) Barry Brown's signature on the Assignment of Trust Deed was authentic; (7) Beehive was not allowed as a matter of law to interfere with HOLLI's right to assume the Brown note,

13. See Talllman's finding on page 5 of TALLMAN's contempt judgment at ex. "23" attached, page 5, which states verbatim: "several courts including this one, have noticed ....evidence of deliberate falsification of documents to influence judicial proceedings".)

and (8) First American Title Insurance Company had committed profound fraud by representing that they were not a legal entity and therefore HOLLI could not acquire jurisdiction over this defendant in Idaho or that First American Title Insurance Company did not have contracting and other trust duties owed to HOLLI.

**(6) The Brown Defendants Colluded With A Utah Court To Obtain A Judgment In Their Favor By Extrinsic Fraud Upon The Court**

(i) After the defendants in Idaho federal case # 2:05-CV-460 obtained a dismissal judgment on jurisdictional issues in their favor from the Idaho federal court based on their implicit fraud and collusion with the Idaho federal judge TALLMAN, and several months after HOLLI was imprisoned on the first federal criminal prosecution initiated by ELI LILLY's attorney, the same Idaho attorneys filed an interpleader action in the Utah court system under the name of a false Title Insurance Company whom HOLLI had never done business with, to wit: First American Title Insurance Agency of Utah, LLC. (Refer back to attorney Craig Christensen's "Notice of Appearance for "First American Title Insurance Company" [emphasis added] filed in the Idaho federal case as Document no. 38 and as exhibit "38" attached hereto.) Following this document is the Return of Summons filed in the Idaho case and bearing the name of First American Title Insurance Company.

(ii) In addition in November of 2005, HOLLI checked the Utah Secretary of State's business entity search to see how HOLLI should serve First American Title Insurance Company. This record found at exhibit "60" attached showed service was to be made upon First American Title Insurance Company at it's Santa Ana, California address. The Dept of Insurance in the state of Idaho however listed a Meridian Idaho address for service of process upon First American Title Insurance Company. HOLLI confirmed this Meridian Idaho address on a google search for First American Title Insurance Company in Meridian Idaho as 55 W. Willowbrook Dr., Meridian Idaho. See this google search following the summons and Notice of Appearance in exhibit "38" attached hereto. As shown on the summons also contained in exhibit "38" attached, HOLLI caused a person in charge of First American Title Insurance

Company's Meridian Idaho office to be personally served with the Idaho federal process. FRCP rule 4(h) permitted HOLLI to serve process in this manner. HOLLI also subsequently caused a copy of the summons and complaint to be mailed at this address as required under FRCP rule 4(h). Moreover, HOLLI filed a service videotape with the Idaho federal court on April 5, 2006 which contained therein service of process on First American Title Insurance Company at the above Meridian Idaho address and caused a copy of this videotape to be personally served on First American's Idaho attorney The FBI seized this videotape for the 2007 criminal prosecution and confirmed that HOLLI had effected proper service of process on First American Title Insurance Company's Idaho office as stated in the summons.

**(iii)** No where in any of the Idaho process served by HOLLI and responded to by atty Christensen on February 3, 2006, is the name of First American Title Agency of Utah LLC mentioned. Moreover as indicated by the Utah Dept. of Insurance, First American Title Agency of Utah LLC has no affiliations with First American Title Insurance Company whatsoever; thus raising the question why in the videotape seized by the FBI, First American Title Insurance Company was printed on the doors of both the Orem, Utah and Meridian, Idaho offices, on the building registries at both locations, and on Jeffrey Barnes' business card. Accordingly, HOLLI requests this court direct HOLDER to investigate into the criminal charges made by HOLLI, order that the depositions of certain notaries be taken with the US AG present at the depositions, order that BARNES produce a canceled copy of the $15,000 check HOLLI deposited with First American Title Insurance Company's Orem office in August of 2005 to see what bank negotiated this check on First American Title Insurance Company's behalf, order BARNES to produce copies of three cancelled checks distributed by First American Title Insurance Company on or about August 15, 2005 in the amounts of: $90.00 made out to the City of Orem; $68.00 made out to the Utah County Recorders office and $5,407.00 made out to the City of Orem, to see if these checks were drawn from a trust account in the name of First American Title Insurance Company or from a trust account in the name of First American Title Agency of Utah LLC.

(iv) As aforestated, First American Title Agency of Utah LLC filed the Utah lawsuit and served HOLLI with this lawsuit in 2007 while HOLLI was falsely imprisoned in a Utah jail on LILLY's federal criminal charges. A google search of First American Title Insurance Agency, LLC. shows that this company has one address which is located at 560 South S. 300 E. Salt Lake City Utah. See exhibit "58" attached for this search. In addition, the Utah Secretary of State shows the same Salt Lake address for this Title Company. See exhibit "59" attached for Utah S.O.S' official record. A google search for First American Title Insurance Companies in Orem Utah listed two addresses: 578 South State Street, Orem, Utah and 1345 W. 1600 North, Orem Utah. See exhibit "61" for google search on First American Title Insurance Company.

(v) On January 3, 2006, Barnes filed an affidavit in the Idaho federal action above stated as document no. 26. On page 2 of 12 of Barnes affidavit @ paragraph 6, exhibit "62" attached hereto, BARNES attested that he met HOLLI, Barry Brown and Ladd Brown in the reception office of First American Title Insurance in Orem, Utah. BARNES notarized each page of his affidavit. The notary on the bottom of this page shows that an "office " notary by the name of Virginia Gregory located at 578 South State Street, Orem, Utah notarized BARNES' affidavit. The notary's address is the same address listed for First American Title Insurance Company on the google search at exhibit "61" attached hereto; this exhibit also including First American Title Insurance Company's website's location address for this Orem office. A check with the state of Utah's Lieutenant Governor's office for verification of notary licensure on Virginia Gregory confirmed that Virginia Gregory was a notary at the address listed for First American Title Insurance Company in Orem, Utah in 2006, but now Virginia Gregory's licensed address is at First American Title Insurance Company's American Fork location at 327 S. 500 East, American Fork, UT 84003. (The State of Utah's verification is forthcoming). HOLLI has been informed that First American Title Insurance Company pays it's notary employees out of it's corporate offices in Santa Ana California. HOLLI's attempts to seek these payroll records to prove agency were obstructed by TALLMAN in the IDAHO litigation. HOLLI

seeks an order directing HOLDER to obtain the payroll records of Barnes, Cole, and Gregory in 2005 in support of HOLLI's criminal charges against First American Title Insurance Corporation. HOLLI also seeks an order directing HOLDER to obtain the check paying Christensen's attorney fees for representing First American Title Insurance Company. It is HOLLI's contention that these records will show that these agents were paid from First American Title Insurance Company's corporate accounting office in Santa Ana California.

**(vi)** In addition, within one month after Judge TALLMAN entered his order dismissing the Idaho litigation for lack of personal jurisdiction, Ladd Brown conveyed the rear part of the property to his girlfriend Courtney Finlinson. First American Title Insurance Company in Orem Utah handled the conveyance. See Exhibit "63" attached for Recorder's record showing this conveyance.

**(vii)** Furthermore, additional proof that First American Title Insurance Company located at 578 South State street, Orem, Utah is the title company at issue in HOLLI's transaction is shown by the Summons served on Barnes in the Idaho litigation. On December 23, 2005, process server Marchant filed a return of summons on BARNES. She attested under penalty of perjury that she personally served BARNES at his place of employment at First American Title located at 578 S. State Street, Orem Utah. See exhibit "64" attached, clerk's document no. 10 for this recorded return of summons. An examination of the PACER docket record shows that BARNES never disputed this service made upon him before or after he entered a general appearance on March 8, 2006 - concurring that he had been properly served. Refer back to exhibit "47" attached for BARNES general appearance. Finally HOLLI has videotaped footage of service upon BARNES at the 578 South State Street, Orem Utah Address which she tendered to the Idaho Court in 2006 and which was seized by the FBI in preparation of the 2007 criminal prosecution. The videotaped footage showed BARNES being personally served at the OREM office for First American Title Insurance Company, showed First American Title Insurance Company's insignia or trademark in the office and on the doors, and HOLLI filed BARNES business card into the record which had printed thereon First American Title Insurance Company's name

along side BARNE'S name.

**(viii)** Therefore HOLLI has presented another instance of serious fraud upon the court by First American Title Insurance Company's Idaho attorney opening up a case in Utah under the name of another title agency office who had no participation in the transaction at hand; all while HOLLI was disabled through imprisonment created directly by First American Title Insurance Company and other complaining witnesses in TALLMAN's contempt judgment. 14

**(ix)** HOLLI timely responded to the Utah complaint filed by an agency office having no standing to sue and attacked the Utah court's jurisdiction to hear the matter. The Utah Court construed HOLLI's challenge as one for personal jurisdiction and denied Holli's challenge. Thereafter, the Brown' s Attorney Higgins subsequently filed a fraudulent motion for summary judgment claiming that the Idaho federal court heard the entire matter on its merits and therefore the Idaho federal judgment was res judicata to the Utah Court action. (Refer back to exhibit "57" attached for relevant portion of the Idaho order dismissing HOLLI's claims for alleged lack of personal jurisdiction over the defendants. Refer back to exhibit "65" attached for motions to dismiss or affidavits supporting motions to dismiss and all asserting lack of personal jurisdiction.)

**(x)** HOLLI countered with her own summary judgment motion and cross objection stating that the Idaho federal court merely dismissed HOLLI's claims with prejudice on personal jurisdiction grounds and did not reach the merits of any of HOLLI's claims. 15 HOLLI made a claim to the funds and demanded specific performance on the real estate contracts... pursuant to the modified agreements. 15

---

14. See exhibit "67" attached for a felony prosecution against a process server in the state of California. Cochran was charged with forgery of proofs of services, preparing false evidence, identity theft and false personation; charges similar to what the complaining witnesses in TALLMAN's idaho contempt prosecution charged HOLLI with in the contempt order and in the 2007 criminal prosecution.

15. **Matosantos Comm. Corp. v. Applebee's Intern. Inc., 245 F.3d 1203 (10th Cir., 2001)** (A dismissal with prejudice under Rule 41(b) for lack of personal jurisdiction does not bar a second action as a matter of claim preclusion, it only precludes relitigation of the issue

**(xi)** On July 7, 2008, HOLLI filed a notice wherein she reminded the court that she had demanded a jury trial on her claims but that she was still incarcerated for an undetermined period of time on the complaining witnesses charges. HOLLI demanded for a second time that the trial court stay the action until she was released from the pending charges. 16 See exhibit "66" attached hereto for HOLLI's handwritten notice which stated again that her claims were not barred under any theory of res judicata because the Idaho federal court had only addressed personal jurisdiction issues and deferring the court to her summary judgment motion.

**(xii)** On July 24, 2008, the state court in collusion with the Browns and in spite of HOLLI's repeated requests to stay the criminal action, entered a false final order which asserted that HOLLI did not make a claim on any funds or demand any other relief. ( Refer back to "66" attached which refers to the filing of a summary

---

of personal jurisdiction in the second forum.) Accord in **Marco Distributing, Inc. v. Biehl, 97 Idaho 853, 555 P.2d 393 (Idaho, 1976); Falcon v. Transportes Aeros de Coahuila, S.A., 169 F.3d 309 (C.A.5 (Tex.), 1999)** ("[w]hen the federal court determined it did not have jurisdiction..., any finding beyond those necessary to make that decision are not 'actually litigated' or 'necessary to the outcome,' and therefore, do not have collateral estoppel or res judicata consequences. See Jack Faucett Assoc., Inc. v. American Tel. & Tel. Co., 744 F.2d 118, 125 (D.C.Cir.1984).)"; **Bush v. Adams, 629 F.Supp.2d 468 (E.D. Pa., 2009)** (A dismissal for lack of personal jurisdiction is not a judgment on the merits citing Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances, 723 F.2d 357, 360 (3d Cir.1983)).
attached and provided the court with relevant parts of the defendants motions to dismiss attached hereto as exhibit "65" to prove the grounds for dismissal of the Idaho federal action.

16. See Thompson v. Connick, 07-30443 (5th Cir. 2008) citing Wallace, 127S.Ct. At 1098, Heck v. Humphrey, 512 U.S.477, 488, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); Gibson v. Superintendent of N.J. Dept. of Law & Pub. Safety- Div. Of State Police, 411 F.3d 427, 435 (3d Cir. 2005), the Firth Circuit analyzed the propriety of stays in civil cases pending criminal charges. The Court held that:

> "...where a plaintiff brings a civil suit before being convicted of any crime which relates to rulings that will likely be made in a pending or anticipated criminal trial, it is mandatory practice for the district court, in the interests of justice, to stay a civil action until the criminal case the likelihood of a criminal case is ended. Id, at 487-488, n.8.
>
> The CONNICK Court held that stay was required in a pending civil case so as not to impugn a criminal court's jurisdiction and in order to provide all parties a fair trial. Civil actions should proceed after the criminal case has been disposed.

judgment motion by HOLLI.) The Utah Court further falsely asserted that it had orders before it wherein the Idaho federal judge found HOLLI's substantive claims meritless; No such orders existed unless they were forged by the Browns. The Utah Court barred HOLLI's claims under the doctrine of res judicata. See Final judgment as exhibit "69" attached hereto. This judgment was never served upon HOLLI.

**(xiii)** When the charges against HOLLI were dismissed one year later as shown in exhibit "27" attached, HOLLI appeared at the Utah court and examined the court file. **HOLLI then learned that her summary judgment motion had been grafted from the court's file.** HOLLI's summary judgment motion sought specific performance of all of the contracts associated with the real property sale, made a claim on the trust funds as consideration to complete the real estate transaction, and demanded that Beehive and HUD be joined as an essential parties to the litigation. HOLLI explained that the real estate transaction was made up of numerous contracts because essential terms in the original real estate contract were left open for future negotiation, to wit: the price HOLLI would pay to finish construction of certain utility lines to the back of the lot. 17 The Browns promised HOLLI in the original contract that these construction costs would not exceed $6,000; the sales price in the original contract was reduced by this amount but the construction work to be performed was left in the sales contract pending HOLLI's execution of a separate but contingent contract with the Browns subcontractor. (See ex. "72" attached for contract). The Browns and HOLLI later learned that the Brown's subcontractor would not perform the contracted construction work unless he was paid an additional $13,000. The Browns

---

17. It is well established law that "if an essential term of a contract is left open for future negotiation, "there is nothing more than an unenforceable agreement to agree" and the contract is void. **Oakrock Exploration Co. v. Killam, 87 S.W.3d 685, 690 (Tex.App. 2002).** Here, The Browns asserted that they would pay their subcontactor $6,000 to construct utility lines to the back lot. The Browns' original sales contract figured in this fee and identified that construction work was to be performed on the property before it was conveyed to HOLLI. HOLLI crossed out the sales fee asserted by the Browns as to be determined by a future contract with the Browns subcontractor. The fees regarding utility construction were left open in the original contract which was placed with First American Title Insurance Company. Hence essential terms were left open in the original real estate contract and until HOLLI negotiated the other contracts to make the original contract whole, there was no enforceable contract. See exhibit "72" attached for modifications to original contract.

induced HOLLI to sign a separate contract with the Brown's subcontractor for $13,000 based on an additional agreement by the Browns to assign an FHA insured Note held by Ladd Brown to Holli Telford and administrated by Beehive Credit Union. All of these contracts made up the whole of the real estate transaction. 18

Holli's summary judgment motion further asserted that Barry Brown after executing the Assignment contract and appearing twice with HOLLI at First American Title Insurance Company's office in Orem, Utah to secure an assumption contract from BEEHIVE in order to enforce the Brown's assignment contract to HOLLI, later accused HOLLI of forging the Assignment Contract when BEEHIVE interfered with the Assignment contract for illicit reasons; one of which included the desire to charge HOLLI for new loan and appraisal fees. (See exhibit "70" attached for Beehive's refusal to allow HOLLI to assume the Note and forcing HOLLI to go through a new loan process that would create additional fees for BEEHIVE.) The Trust Deed Note subject to assignment and assumption did not include a "due on sale" provision in the Note and expressly provided that it could be assigned. (See Trust Deed Note as exhibit "71" attached hereto for examination.)

The prosecutor in the two year criminal prosecution brought against HOLLI in re USDC-Utah case no. 2:07 CR 272 had the Assignment of the Trust Deed examined for forgery as asserted by Barry Brown. The results of the examination revealed that the ink on the assignment document was original ink, that the "unique"

---

18. Texas law holds that "[a]s a general rule, several instruments comprising a single transaction are to be construed together." Jones v. Fuller, 856 S.W.2d 597, 601 (Tex. App. - Waco 1993, writ denied). See also Terrell v. Graham, 576 S.W.2d 610, 611 (Tex.1979); Trustees of the Casa View Assembly of God Church v. Williams, 414 S.W.2d 697, 701 (Tex. Civ. App. - Austin 1967, no writ). As stated by the Supreme Court of Texas, "[s]eparate instruments contemporaneously executed as part of the same transaction and relating to the same subject matter may be construed together as a single instrument . . . even though the result be to modify one of the instruments which, standing alone, would have a different construction. Thus a deed absolute in form, substance and effect has been held to be wholly conditional, the condition being express in a contemporaneous contract." Rudes v. Field, 204 S.W.2d 5, 7 (Tex. 1947). The Contract of Sale, the Assumption Agreement, and the Warranty Deed evidence a single transaction and the language of the Assumption Agreement is considered as a single provision within the context of an overall agreement. See id. Humphrey v. C.G. Jung Educ. Ctr. of Houston, Tex., 714 F.2d 477, 480 (5th Cir. 1983).

signature of Barry Brown matched all of Barry Brown's other signatures and did not match the unique characteristics of HOLLI's handwriting, that First American Title Insurance Company's officer Jeffrey Barnes admitted that Barry Brown accompanied by HOLLI - twice appeared before BARNES in August of 2005 to enforce the Assignment agreement, and that it was not until BEEHIVE interfered with the Assignment of the Trust Deed - that the Browns accused HOLLI of forging the assignment and thereafter instructed BARNES to default the escrow and tender the remainder of HOLLI's $9,434.00 to the BROWNS as default damages on the original sales contract - which was void. The prosecutor determined that HOLLI did not forge the Assignment of Trust Deed document based on all of the foregoing testimonial admissions and after determining that the Assignment was an original and authentic document that according to third party witnesses, the Browns sought to enforce.

HOLLI also further examined the court's file for the documents supporting the res judicata ruling and found only 1 order by TALLMAN comprising the single page rule 58 judgment stating the Idaho federal action had been dismissed with prejudice. The Brown's and First American Title Insurance's Idaho attorneys reportedly gave oral argument at the June 26, 2008 summary judgment hearing where they falsely orally detailed for the Utah court how the Idaho federal judge had allegedly reached HOLLI's substantive claims on their merits and barred HOLLI from suing any of these defendants in any future action. None of the oral presentation or argument was memorialized by a court reporter as required by law; thus preventing HOLLI from examining specifically each fraudulent act committed at this hearing.

**(xiv)** While HOLLI was in jail for almost three years in total as a pretrial detainee, HOLLI's Idaho home shown in exhibit "29" attached, was gutted, the well was sabatouged, the power was interrupted thus breaking water pipes in the home, and HOLLI's 500 gallon propane tank was stolen. In addition, IDOT stole 2 acres of HOLLI's 5 acre parcel of land without noticing HOLLI or proferring HOLLI just compensation. HOLLI filed an administrative claim with the Department of Justice given TALLMAN, EDWARDS and other federal officers and attorneys aided and abetted the fraud which caused HOLLI to be wrongfully prosecuted, to lose her causes of

action via ex parte proceedings brought by the Idaho tort defendants' attorneys, caused HOLLI's absence from her Idaho home resulting in massive theft and vandalism which HOLLI believes was not random but was committed to steal evidence out of HOLLI's home and to retaliate against HOLLI, and caused other commercial damages to HOLLI with respect to two freeway real properties HOLLI acquired to sustain her interstate business.

## B. Lundahl v. NAR Inc. et al., USDC- Idaho # 2:05-CV-127:

### (1) Attorney Mark Olson Representing The NAR Litigants Interests In the Idaho Contempt Action Corruptly Asserted That the Utah Supreme Court Contempt Judgment Entered Against HOLLI Conclusively Decided ALL Matters RE Torts Committed by NAR

(i) On pages 2-3 of TALLMAN's criminal contempt judgment found at exhibit "23" attached, TALLMAN found pursuant to the claims of attorney Mark Olson who owned NAR Inc. aka "North American Recovery, Inc.", that HOLLI's case had been decided by Utah Supreme Court Justice Christine Durham on appeal in April of 2003 and that Justice Durham found that HOLLI could not pursue the claims assigned to her by KELLI 19 because those claims did not belong to HOLLI in her own

---

19. **Le Mieux Bros. v. Tremont Lumber Co., 140 F.2d 387 (5th Cir., 1944)** (Title 28, U.S.C.A. Section 41(1) provides that Chose in actions are those rights of action acquired by assignment. This and other courts have held that if the assignee was possessed of the right to sue by virtue of equitable subrogation or assignment, the subrogee or assignee would not be prohibited from maintaining an action upon the matter assigned.); **Rawoof v. Texor Petroleum Co., Inc., 521 F.3d 750 (7th Cir., 2008)** (Under Rule 17(a), as we have noted, "[e]very action shall be prosecuted in the name of the real party in interest." This is a procedural rule requiring that the complaint be prosecuted in the name of the party to whom that claim "belongs" or the party who "according to the governing substantive law, is entitled to enforce the right." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 193 (2d Cir.2003) (quoting 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1543, at 334 (2d ed.1990). An assignee is the true party in interest with the sole right to prosecute an assigned chose in action. ); **Silvers v. Sony Pictures Entertainment, Inc., 330 F.3d 1204 (9th Cir., 2003)** (The assignment set forth in clear, precise terms that the assignor transferred the past, prior accrued choses in action to the assignee. Only the assignee had the right to pursue the litigation citing ***Prather,* 410 F.2d at 699 n. 1, 700 (5th Cir. 1968)** (an express assignment of causes of action is permitted unless the assignment would conflict with another law of greater weight and effect.). See also Corpus

right citing UCA section 78-9-10(3); a law which was repealed as in violation of the Contracts Clause of the US Constitution. 20 (See exhibit "14" attached, pg.3, fn. 4).

---

Juris Secundum 6A C.J.S. Assignments § 104 which defines the procedures for assignment: (T)he assignee may sue where he retains a beneficial interest in the chose in action assigned; thereafter the assignor has no legal claim.; See also **Hamilton v. United Healthcare, 310 F.3d 385 (5th Cir. 2002)** (subrogation is synonymous to assignment in that it is "[t]he substitution of one person in the place of another with reference to a cause of action or lawful claim." BLACK'S LAW DICTIONARY 1427 (6th ed.1990), and Rohner, Gehrig & Co. v. Capital City Bank, 655 F.2d 571, 579 (5th Cir.1981) (observing that, under the law of many states, "an assignment agreement is equivalent to a subrogation agreement". One person (the subrogor) assigns to another person (the subrogee) a claim that the subrogor has against a third party.) **Hefley v. Jones, 687 F.2d 1383, 1387-88 (10th Cir.1982)** (Citing MOORE, supra, § 17.11[1][a]: "Because the assignor has assigned the entire claim, the assignor retains no interest on which to base an action." Held: upon assignment of all rights in contract, assignees became sole parties capable of bringing suit.). Accord in **Rogers v. Samedan Oil Corp., 308 F.3d 477 (5th Cir. 2002); Thatcher v. Merriam, 240 P.2d 266, 121 Utah 191 (Utah 1952); Gray v. Gray, 304 P.2d 650, 78 Idaho 439 (Idaho, 1956); Joplin v. Ely, 365 P.2d 735 (Okla., 1961)** (Although the assignment of a chose in action was without consideration, the assignee is the real party in interest under 12 O.S.1951 § 221 with the sole rights to maintain a suit thereon in his own name.); **Mallios v. Baker, 11 S.W.3d 157 (Tex., 2000)** (Baker assigned his claims to Herron and therefore is precluded from defending on the claims. See (TEX.CIV.PRAC. & REM.CODE § 5.001 provides by statute for assignment of both negotiable and non-negotiable written instruments. TEX.CIV.PRAC. & REM.CODE § 71.021) provides by statute for the assignment of personal injury claims.); **San Antonio A.P.Ry.Co. v. Cockvill, 72 Tex 613, 10 S.W. 702** (The rule is followed in Texas. In **1 Tex.Jur.Supp. 504, Assignments, Sec. 37** and reads as follows: Suit by assignee having possession and apparent legal title.--'It is the established rule in this state that one having the possession of a written instrument, and the apparent legal title thereto, whether such instrument be negotiable or non-negotiable, is the true party to sue thereon in his own name, and that the party bound thereon cannot resist payment on the ground that such holder is not in fact the owner, but that in equity it belongs to another.' **Ormsby v. Ratcliff, (Tex.Civ.App.) 22 S.W.2d 504.)** See also **International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, 283 v. Scofield International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local 133, Uaw v. Fafnir Bearing Co,** 382 U.S. 205, 86 S.Ct. 373, 15 L.Ed.2d 272 (1965) (Intervention should be granted when the rights of the moving party will be effected by any judgment entered.); **In re C. W. Mining Company, Bankruptcy Number: 08-20105 (Bankr. Utah 2009)** ("[the Debtor] made an absolute assignment, transfer and conveyance to Standard of all of [the Debtor's] right, title and interest in and to the described property". Standard is the only one with rights to litigate the claims.).

20. The Contracts clause is found at U.S. Const. art. I, § 10. See **U.S. Supreme Court in Energy Reserves Group v. Kansas Power & Light, 459 U.S. 400, 411-12, 103 S.Ct. 697, 704-05, 74 L.Ed.2d 569 (1983)** (The threshold inquiry is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship" inclusive of assignment contracts.); **American Surety Co. v. Lewis State Bank,** 58 F.2d 559 (5th Cir. 1938); City of New Orleans v. Whitney, 138 U.S. 595, 605- 606, 11 S.Ct. 428, 34 L. Ed. 1102; **Brown v. Fletcher, 235 U.S. 589, 35 S.Ct. 154, 59 L.Ed. 374 (1918)** (Held: Federal court's have

In fact, TALLMAN chastised HOLLI for attempting to bring a backwards access lawsuit against the NAR litigants. See Tallman's order @ exhibit "23" attached, page 3, column 1, paragraph 1 for TALLMAN's finding that HOLLI's "belligerent attempt to evade collateral estoppel supports the allegations below that her modus of operendi is to re-litigate claims in a new jurisdiction once they have been dismissed elsewhere as frivolous" citing to LUNDAHL v. QUINN, 67 P.3d 1000 (April 13, 2003) as support. Backwards access claims are all about litigating the substance of a claim which was obstructed by official misconduct. 21 TALLMAN's order directing the clerk to obstruct

---

jurisdiction over actions brought by assignees to recover upon a promissory note or other chose in action and a state official cannot impair plaintiff's contract rights as protected by the Constitution.); **Johnson v. County of Fresno, 4 Cal.Rptr.3d 475, 111 Cal.App.4th 1087 (Cal. App., 2003)** (Once the transfer has been made, the assignor lacks standing to sue on the claim. Code Civ. Proc., § 368.5. Same in Purcell v. Colonial Ins. Co. (1971) 20 Cal.App.3d 807, 97 Cal.Rptr. 874.) (In fact, once the transfer has been made, the assignor lacks standing to sue on the claim.) See also Acme Blacktop Paving Corp. v. Brown & Matthews, Inc., 30 A.D.2d 1042, 294 N.Y.S.2d 826 (App.Div.1968) (An unequivocal and complete assignment extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor.) Accord in **Cardtronics v. St. Nicholas Beverage Discount Center, Inc., 8 A.D.3d 419, 778 N.Y.S.2d 299, 2004 NY Slip Op 5182 (N.Y. App. Div., 2004); United States v. Morris, 10 Wheat. 246, 23 U.S. 246, 6 L.Ed. 314 (1825)** (In England, and in this country, it has along since been settled, that the assignee of a chose in action may sue in the name of the assignor, who has no standing to interfere with the suit.); **Martin v. Morgan Drive Away, Inc., 665 F.2d 598 (C.A.5, 1982)** (the assignee is the only party with standing by virtue of ownership of an assignment from MTTI). Same in Piambino v. Bailey, 610 F.2d 1306 (5th Cir.), cert. denied, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980); Audio-Visual Marketing Corp. v. Omni Corp., 545 F.2d 715 (10th Cir. 1976); See also Knight v. Bowyer, 2 DeGex & J. 421.) Denley Rentals v. Etheridge W2000-00189-COA-R3-CV (Tenn. Ct. App., 2001) (A chose in action may be assigned orally or in writing, for valuable consideration.); Finally see ***Vermont Agency of Natural Res's v. United States ex rel. Stevens***, 529 U.S. 765, 774, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) ("[A]dequate basis for the . . . suit . . is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor and hence to himself."; *see also* Restatement (Second) of Contracts § 336(1) (1981) ( After assignment, the assignor retains no rights to litigate the claims it has assigned, away.)).

21. See See also **Foster v. City of Lake Jackson, 28 F.3d 425, 430 (5th Cir.1994)** ("the right of access is implicated where the ability to prosecute a suit is delayed, or blocked altogether.") See also ***Harbury III, 536* U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)** (stating that backward-looking denial-of-access claims must identify an underlying claim that "cannot now be tried. "Backward-looking claims" include cases where a cover-up "caused the loss or inadequate settlement of a meritorious case," *id.* at 414, 122 S.Ct. 2179 (citing *Foster v. Lake Jackson*, 28 F.3d 425, 429 (5th Cir.1994); *Bell v. Milwaukee*, 746 F.2d 1205, 1261 (7th Cir.1984)), or where a cover-up caused "the loss of an opportunity to sue"

the filing of HOLLI's First Amended Complaint in the NAR litigation as shown in exhibits "48", "49" and "50" attached hereto is evidence that official misconduct defeated HOLLI's proper lawsuit against the NAR litigants. Moreover TALLMAN's order was equally void because it was based on the void Lundahl v. Quinn contempt judgment.

(ii) It is undisputed that the counterclaims prosecuted in the Utah NAR action belonged to HOLLI. (See Caption page of verified First Amended Counterclaim filed in the bankruptcy court in 2003 as exhibit "73" attached.) It is undisputed that Utah Judge Quinn entered a dismissal with prejudice judgment on HOLLI's claims presented in her First Amended Counterclaim. (See exhibit "74" attached, paragraph 2 for relevant part of this judgment against HOLLI and removed to the bankruptcy court.) It is also undisputed that the attorneys fees judgment invalidly entered against Kelli - who had no standing in the Utah litigation - was assigned to HOLLI and also removed to the bankruptcy court. (See exhibit "75" attached for the caption page of this assigned judgment.). It is undisputed that the NAR litigants corruptly procured the dismissal of Holli's main bankruptcy case and and all of HOLLI's removed proceedings based on the theory of lack of residual subject matter jurisdiction. See generic dismissal order as exhibit "76" attached hereto.

---

because it extended through the limitations period, *id.* (citing Swekel v. City of River Rouge, 119 F.3d 1259, 1261 (6th Cir.1997)). *Harbury III* evidences at least three elements necessary to prove a backward-looking denial-of-access claim: an arguable underlying claim, complete foreclosure of a remedy, and causation. Moreover, the longer the delay for a fair trial, the more substantial the denial of access. Bell v. City of Milwaukee, 746 F.2d 1205, 1261-62 (7th Cir.1984) (holding that official obstruction which caused a twenty-year delay violated plaintiff's right of access to the courts); *re Cincinnati Radiation Litig.*, 874 F.Supp. at 824 (holding that a cover-up which caused a twenty-two to thirty-four-year delay violated plaintiffs' right of access to the courts). See also Briggs v. Goodwin, 186 U.S.App.D.C. 179, 569 F.2d 10 (D.C.Cir.1977), cert. denied, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978), held: where the prosecutor took the witness stand during the grand jury proceeding and falsely declared that none of the witnesses before the grand jury were agents or informants of the United States of America, the prosecutor's actions were investigatory as opposed to advocatory, and the grant of absolute immunity was lost when the prosecutor lied about the grand jury witnesses status." Id. 186 U.S.App.D.C. at 190, 569 F.2d at 21. Here, there is serious question as to whether Judge TALLMAN is civilly immuned for his conduct of directing the clerk to graft HOLLI's complaint from the court record. Nevertheless TALLMAN would not be immuned criminally; hence involving the US Attorney General in this litigation.

**(iii)** Holli submitted a written objection to the competency of the Utah Supreme Court contempt judgment cited as LUNDAHL v. QUINN, 67 P.3d 1000 (April 13, 2003) - to TALLMAN during the criminal contempt trial. When TALLMAN failed to record HOLLI's written objection into the court file, HOLLI filed her written objections into the record. TALLMAN illegally struck HOLLI's meritorious objections to obstruct justice. HOLLI's written objection urged that the Utah supreme court contempt judgment was void on the following grounds: (a) violations of the automatic stay of the bankruptcy code 22, (b) violations to the bankruptcy code's removal statute 23, (c) failure after removal - to allow HOLLI to directly attack the fraudulent and void judgment entered by Utah Supreme Court Justice Christine Durham - under the

---

22. Any order that violates the automatic stay of the bankruptcy court is void ab initio. *Gruntz v. County of Los Angeles (In re Gruntz),* 166 F.3d 1020, 1025-26 (9th Cir.1999)); The state orders are a legal nullity and void. *Gruntz,* 166 F.3d at 1025-26. See **Davis v. Bayless, 70 F.3d 367, 375-76 (5th Cir. 1995);** *Pavelich v. McCormick (In re Pavelich),* 229 B.R. 777, 782-83 (9th Cir. BAP 1999) (Through the preemption of bankruptcy law, a state court cannot sit in judgment over determinations of the provisions of Title 11. In the instance where a state court's action violates the automatic stay, the Rooker -Feldman doctrine is inapplicable. The doctrine relies upon the premise that where the state "court had jurisdiction of both the subject matter and the parties; that a full hearing was had therein; that the judgment was responsive to the issues, and that it was affirmed by the Supreme Court of the State on an appeal. Under federal bankruptcy law, a state court action, proceeding, and judgment rendered in violation of the automatic stay are a legal nullity and void ab initio, and thereby not entitled to the preclusive effect they would otherwise garner under the Rooker-Feldman. *Gruntz,* 166 F.3d at 1026; *Audre, Inc. v. Casey (In re Audre),* 216 B.R. 19, 29 (9th Cir. BAP 1997). The Supreme Court has summed up this issue in holding that "there appears to be only one exception to this hard and fast Rooker-Feldman rule of federal-state comity, and it comes into play when the state proceedings continue in spite of a preemptive injunction under the bankruptcy code and therefore are considered a legal nullity and thus void ab initio." *James,* 940 F.2d at 52 (*citing* Kalb v. Feuerstein, 308 U.S. 433, 438-40, 60 S.Ct. 343, 84 L.Ed. 370 (1940)).

23. See **Eog Resources Inc. v. Vela (Tex. App., 2003)** (This is an interlocutory appeal of a temporary injunction. On March 11, 2002, appellant provided us with notice that the lawsuit underlying this appeal had been removed to the United States District Court for the Southern District of Texas, Laredo Division. "Once removal is effected, 'the State court shall proceed no further unless and until the case is remanded.'" *Meyerland Co. v. F.D.I.C.,* 848 S.W.2d 82, 83 (Tex. 1993)); **In re Zega Companies, No. 03-07-00537-CV (Tex. App. 11/16/2007)** (Tex. App., 2007) (If a case has been removed to federal court, this Court may not take any further action unless and until the case is returned to state court.); **In re Legends on Lake LBJ, Ltd., No. 03-07-00110-CV (Tex. App. 2/22/2007) (Tex. App., 2007)** (We deny the petition for writ of mandamus because this Court is without jurisdiction based on removal).

bankruptcy court's jurisdiction 24; (d) failure to notice HOLLI that a contempt proceeding (automatically stayed under the bankruptcy code) was being considered by the Utah Supreme Court against HOLLI as the respondent, (e) failure to dismiss the Utah Supreme Court proceeding as MOOT when judge QUINN entered an order joining HOLLI to the NAR I litigation, (f) implicit extrinsic fraud and collusion repeatedly committed by the NAR litigants in obtaining the trial court and appellate judgments against HOLLI, and (f) failure to impose disciplinary sanctions against NAR'S counsel for uncontroverted violations of the professional ethics code for attorneys. 25

---

24. See also **In re Eads, Case No. 05-42356 (Bankr. E.D. Tex., 2009)** (Res judicata does not bar a direct attack on a judgment - following Watts v. Pinckney, 752 F.2d 406, 410 (9th Cir. 1985); In re Acorn Hotels, LLC, 251 B.R. 696, 700 (Bankr. W.D. Tex. 2006) (Rule 60(b) "provides a procedure whereby a party may be relieved of a final judgment." See Liljeberg v. Health Serv. Acquisition Corp., 486 U.S. 847, 863 (1988). Bankruptcy Rule 9024 generally incorporates Rule 60 into all matters governed by the Bankruptcy Rules and permits a direct attack on a removed judgment.) "A judgment which is void because of lack of jurisdiction or because the judgment is vitiated by fraud or usurpation of power, is not entitled to full faith and credit in a court sitting in bankruptcy." See Kelleran v. Andrijevic, 825 F.2d 692, 694 (2nd Cir.1987), cert. denied, 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988). See **Browning v. Navarro, 887 F.2d 553 (C.A.5 (Tex.), 1989)** (Bankruptcy courts are authorized to vacate a fraudulent state court judgement. 11 U.S.C Sec. 105 is "an authorization to correct the unconstitutional action of a state court. See H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 317 (1977), reprinted in 2 Collier on Bankruptcy: Appendix (L. King 15th ed.1989) and S.Rep. No. 95-989, 95th Cong., 2d Sess. 29 (1978), reprinted in 3 Collier on Bankruptcy: Appendix (L. King 15th ed.1989), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5815, 6274. Section 105, moreover, authorizes a bankruptcy court to void a state court judgment on the grounds provided under rule 60(b).); See also **In re Funches, 381 B.R. 471 (Bankr. E.D. Pa., 2008)** (In contradiction to *Rooker-Feldman* theory, **bankruptcy courts are empowered to avoid state judgments,** *see, e.g.,* 11 U.S.C. §§ 544, 547, 548, 549; **to modify them,** *see, e.g.,* 11. U.S.C. §§ 1129, 1325; and **to discharge them,** *see, e.g,* 11 U.S.C. §§ 727, 1141, 1328 . Thus, final judgments in state courts are not preclusive in United States bankruptcy courts. Indeed, the rule has long stood that state court judgments are subject to collateral attack in the federal courts and direct attack if removed to the federal courts.)

25. See **Living Designs Inc. v. E.I. DuPont De Nemours, 431 F.3d 353 (9th Cir. 2003)** (Litigation misconduct is not immuned from a RICO prosecution. Fraud under the mail fraud and obstruction of justice statutes is established when opposing counsel omits information or fabricates documents to obstruct an official proceeding. )See too **Clark v. Stipe lawfirm, 320 F.Supp.2d 1207 (W.D. OK 2004)** (each proceeding obstructed by the defendant in an overall scheme constitutes a separate act of obstruction of justice.). Also see **Deck v. Engineered Laminates,** 349 F.3d 1253 (10th Cir. 2003)(each act of fraud which results in dismissal of a cause of action is remedial under RICO through the mail fraud statute.);

(iv) Moreover the failure of TALLMAN to recuse also raised serious partiality concerns given TALLMAN owned upwards of $2.5 million stock interests in other complaining witnesses appearing in the NAR litigation. 26 Attached hereto as exhibit "30" is a copy of TALLMANS' financial disclosure report showing circled investments with companies that acted as complaining witnesses in the Idaho criminal contempt trial. During the 90 minute illegal criminal contempt trial, HOLLI objected to TALLMAN sitting on her case because of his financial interests. HOLLI also accused TALLMAN of usurping his power to conduct a criminal contempt trial, of

---

26. See **Caperton v. A. T. Massey Coal Co., No. 08-22 (U.S. 6/8/2009) (2009)** Held: In all the circumstances of this case, due process requires recusal. Pp. 6-20. (a) The Due Process Clause incorporated the common-law rule requiring recusal when a judge has "a direct, personal, substantial, pecuniary interest" in a case, Tumey v. Ohio, 273 U. S. 510, 523, but this Court has also identified additional instances which, as an objective matter, require recusal where "the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable," Withrow v. Larkin, 421 U. S. 35, 47. Citing cases: (1) **In re Murchison, 34,9 U. S. 133** (In the criminal contempt context, where a judge had no pecuniary interest in the case but had determined in an earlier proceeding whether criminal charges should be brought and then proceeded to try and convict the petitioners.); Mayberry v. Pennsylvania, 400 U. S. 455, 466 (Finding that "no man can be a judge in his own case, "and " no man is permitted to try cases where he has an interest in the outcome," id., at 136, the Court noted that the circumstances of the case and the prior relationship required recusal. In reiterating that the rule that "a defendant in criminal contempt proceedings should be [tried] before a judge other than the one reviled by the contemnor," the Court noted that the objective inquiry is not whether the judge is actually biased, but whether the average judge in his position is likely to be neutral or there is an unconstitutional "`potential for bias'"); **Aetna Life Ins. Co. v. Lavoie, 475 U. S. 813** (Recusal was also required where an Alabama Supreme Court justice cast the deciding vote upholding a punitive damages award while he was the lead plaintiff in a nearly identical suit pending in Alabama's lower courts.); **Republican Party of Minnesota v. White, 416 F.3d 738 (8th Cir. 2005)** (Criminal civil rights violation when judge sits on a cases in which he has a pecuniary interest. Supreme court justice won position to seat after the losing party in a case funded the judge's campaign. Error for Judge to sit on case at appellate level); Bracy v. Gramley, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (the Court reiterated that "the floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Id. at 904-05, 117 S.Ct. 1793); **Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 821-25, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986)**; **Ward v. Monroeville, 409 U.S. 57, 58-62, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972)**; **Johnson v. Mississippi, 403 U.S. 212, 215-16, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971)** (per curiam) (holding that due process was violated where a judge presided in a case involving a party who had successfully sued him earlier. "Trial before `an unbiased judge is essential to due process."); **Fredonia Broadcasting Corp.Inc. v. RCA Corp., 569 F.2d 251 (Tex. 1978)** (Where the record displays potetial ex parte communications between judge and an attorney in the

case, and that attorney worked as a prior law clerk for the judge, recusal is required.) tampering with court files to orchestrate a coverup scheme in favor of his vested interests - the complaining witnesses, and of retaliating against HOLLI for pursuing her constitutional rights. Under these serious charges advanced by HOLLI, TALLMAN should have been immediately removed from HOLLI's cases and any order entered by TALLMAN vacated. See exhibits "28" and "77-1 through 77-4" attached for authorities outlining what constitutes judicial misconduct.

**(2) HOLLI Is Entitled to A Backwards Access Claim Against The NAR Litigants Based On Years of Litigation Misconduct Which Included Colluding With Judges To Obstruct HOLLI's Rights To Relief**

The NAR litigants engaged in years of misconduct against HOLLI incorporating judges in their schemes. The facts underlying this misconduct are as follows:

(i). From 1997 to 2003, the state of Utah without cause denied HOLLI a drivers license in order to maliciously interfere with HOLLI's right to travel. This interference was directly prompted by the private party tort defendants in Holli's pending actions - to preclude HOLLI from traveling to the courts to file judicial process.

(ii). HOLLI was prosecuted in the criminal court systems of the state of Utah more than 15 times from 1997 to 2003 for driving on an expired Utah driver's license. Each prosecution termed in holli's favor for failure to prove the corpus delicti of the crime. Holli nevertheless appealed the dismissals entered in her favor because the trial courts in each case refused to direct the Utah Public Safety director to renew HOLLI's Utah driver's license.

(iii). The Utah appellate courts nevertheless found HOLLI's appellate petitions moot in spite of the well established exception to the mootness doctrine to wit: that HOLLI would continue to be prosecuted for the same traffic crimes in the future as HOLLI needed to travel for a myriad of reasons, not the least of which included to pursue her occupational interests. HOLLI's relentless appeals on the terminated criminal prosecutions, would ultimately result In Utah Supreme Court Judge Christine Durham corruptly entering a contempt judgment against HOLLI.

**(iv).** The controversy underlying the voided Utah Supreme Court writ proceeding directed at a state judge Antony Quinn and seeking an order compelling the district court to address HOLLI's Notices to Submit for Decision re Holli's filings which asserted that KELLI lacked standing in the NAR lawsuit based on HOLLI's ownership of the NAR debt and Counterclaims as presented in HOLLI's First Amended Counterclaim (see exhibit "11" attached for a certified copy of the caption page of HOLLI's verified Counterclaim), originated from a contract dispute with the assignor Kelli Lundahl and fraudulent collection activities ultimately accruing against both Kelli and HOLLI.

**(v).** Specifically, Kelli owned several businesses and Kelli's personal credit was material in obtaining business assets on credit. NAR knew this and decided to extort Kelli of monies not due and owing OLYMPUS, by threatening to destroy Kelli's personal credit if Kelli did not pay certain extorted and fabricated sums relative to a dental contract. 27

**(vi).** NAR, a national credit reporting agency, sent Kelli a dunning letter on February 14, 2002 setting forth the fabricated sums allegedly due OLYMPUS upon prospective litigation of the subject contract. (See exhibit "1" attached for dunning letter.) Attached to the dunning letter was a copy of an already prepared complaint by NAR which had been **filed in the wrong venue** - in order to obtain favor with certain judges. (Kelli was a citizen of Utah County not Salt Lake County. The lawsuit was filed in a Salt Lake County court that was friends of the owner of NAR, Attorney Mark Olson.) See exhibit "2" attached for the complaint filed by NAR.

**(vii).** On March 19, 2002, Kelli issued a check paying NAR the extorted sum set forth in the dunning letter and in the complaint - in order to protect

---

27. See **Gillmor v. Thompson, 490 F.3d 791, 799 (10th Cir. 2007)** ("Congress meant to punish as extortion any effort to obtain property, by inherently wrongful means, such as force or threats of economic harm, criminal prosecution, etc.) ; See also **Deck v. Engineered Laminates, 349 F.3d 1253 (10th Cir. 2003)** (Each interference with ability to compete in commerce is a Hobbs Act violation and remedial through RICO.) **Malandris v. Merrill Lynch, Pierce, Fenner & Smith, 703 F.2d 1152 (10th Cir. 1981)** ( RICO Fraud which causes plaintiff to lose life savings and assets.); Hy Cite v, Bad Business Bureau, 418 F.Supp.2d 1142 (Ariz. 2005) (RICO claim stated for exortion and wire fraud when defendants used the internet to defame plaintiff's businesses to obtain concessions from plaintiff.)

her personal credit and economic enterprises. The dunning letter violated Utah's communications fraud statute given the threat to ruin Kelli's credit based on a fabricated debt.

(viii). HOLLI personally delivered the check to NAR's counsel's office and obtained a verbal agreement from NAR's attorney that NAR would immediately dismiss the complaint as moot. NAR negotiated Kelli's check for $597.21 on March 19, 2002 - as certified by Wells Fargo Bank. (See exhibit "3" attached for Wells Fargo's certified copy of the canceled check.)

(ix). Irrespective that all of the demands made in the complaint had been mooted by the negotiation of the foregoing check, eight days after NAR cashed Kelli's check, NAR through unnoticed and ex parte procedures, obtained a default certificate against Kelli on March 27, 2002 by producing a false service certificate to the clerk of the court which falsely represented that NAR had served KELLI with notice of the default certificate. See exhibit "4" for this default certificate.

(x). After obtaining the default certificate from the clerk, NAR's counsel immediately met ex parte with Judge FRATTO and fraudulently obtained a default judgment FOR THREE TIMES THE DEMAND MADE IN NAR'S COMPLAINT. NAR then failed to serve Notice of the default judgment upon KELLI as required under Utah law. See exhibit "5" attached for void default judgment. See exhibit "78" attached for default certificate forms printed on the state of Utah's court website and including the required certification of service as part of the judgment process. See exhibit "77-2" attached for Florida Supreme Court judgment sanctioning a judge for engaging in ex parte communications with counsel.

(xi). Kelli learned about this default judgment when applying to buy a commercial building for her business. See exhibit "10" attached for Experion credit report reflecting this default judgment. Kelli was denied credit as a result of NAR reporting this false debt.

(xii). Two months after the default judgment had been entered, Kelli appeared before the state court and obtained an order vacating the void default judgment based on fraud upon the court by NAR's counsel. At that time, Kelli

apprised the court that she was filing a counter suit against NAR and others for unlawful debt collections practices, tortious interference with prospective economic gain and racketeering violations. (See exhibit "6" attached for order vacating the default judgment on the grounds of fraud committed by NAR's counsel.).

**(xiii).** Kelli submitted the vacation order to the credit reporting companies. Equifax refused to remove the false credit report because NAR's counsel instructed Equifax to keep the false credit listing on Kelli's credit report.

**(xiv).** Accordingly, on June 6, 2002, Kelli filed a counter suit in the same case against NAR, NAR's attorney, Olympus dental, Olympus employees and Equifax for violations of Utah's racketeering act, the unlawful debt collection practices act, the false credit reporting act and for abuse of process. At the time Kelli filed her counter suit, Kelli paid a filing fee and jury fees for her counter/cross complaint. The clerk's office negotiated Kelli's "filing fees" payment.

**(xv).** Kelli subsequently served NAR's counsel with her counter-suit. After NAR received service of Kelli's counter-suit, NAR's counsel appeared at the clerk's office, checked out the court file, grafted Kelli's counter suit out of the court's file, and then afterwords, falsely represented to the clerk that Kelli had not filed a counter-suit according to the documents contained in the court's file to corruptly induce the clerk to alter the court docket to reflect that no counter- suit had been filed. NAR's Counsel completely forgot about the check Kelli had used to pay for jury fees and the filing fee for the cross-complaint which added more parties. This negotiated check would later be used against NAR to reinstate the case.

**(xvi).** Shortly after grafting Kelli's complaint from the court's file, on June 17, 2002, NAR's counsel, again ex parte, filed a motion to dismiss the complaint found at exhibit "2" attached, on the false basis that Kelli had settled her claims with NAR. See exhibit "7" attached for this motion to dismiss. NAR never served this "motion to dismiss" upon Kelli as falsely represented in the certificate of service.

**(xvii).** The next day, NAR again met ex parte with Judge Fratto and in violation of the notice and hearing rules for the state of Utah, colluded with Judge Fratto to sign a dismissal with prejudice order which falsely claimed that the entire

case and controversy had been settled. See exhibit "8" attached for dismissal with prejudice order signed by Judge Fratto on June 18, 2002.

**(xviii).** In July of 2002, Kelli learned of this fraudulent dismissal order and filed an objection with the state court which included a demand to have Judge Fratto removed from the case. Kelli's case was transferred to Judge Lubeck.

**(xix).** On July 8, 2002 at a hearing conducted by Judge Lubeck, Kelli complained that opposing counsel had checked out the court file afterwhich Kelli's counterclaim suddenly disappeared. Kelli presented her negotiated check paying for filing fees and jury fees on her counter-suit and kelli also presented a conformed copy of her counter-suit bearing the original stamp of the state court as proof that she made the respective filing and that criminal tampering with the court's file had occurred. Kelli demanded that NAR's counsel be disciplined for his criminal conduct of tampering with the court's file. Because NAR's counsel denied any criminal misconduct, the Court just set aside the dismissal judgment and directed Kelli to work with the court clerks to reconstruct the court file to include Kelli's countersuit pleading. See exhibit "9" attached for Judge Lubeck's vacation and reconstruction order. Because no referral was made by judge LUBECK to local police authorities to address NAR's counsel's criminal misconduct, NAR's counsel continued to graft records from the court's file.

**(xx).** On July 9, 2002, Kelli assigned her debt claim and her counter-suit claims to HOLLI for prosecution. See **Valero Eastex Pipeline v. Jarvis, 990 S.W.2d 852, 855 (Tex. App. 1999)** (the general rule in Texas is that a cause of action is a property right that may be assigned pursuant to the contracts clause of the Constitution.).

**(xxi).** On July 10, 2002, HOLLI filed Kelli's assignment agreement and a verified First Amended Counterclaim as assignee, with the clerk of the court. At the time of filing, HOLLI requested that the court clerk provide her with a certified copy of the verified First Amended Complaint in order to help protect against another grafting act by NAR's counsel. See exhibit "11" attached for caption page of first Amended complaint certified as filed with the state court on July 10, 2002.

**(xxii).** Subsequent to the filing of HOLLI's verified first amended

complaint, NAR arranged to have the case transferred from Lubeck's court to Pueler's Court to Quinn's court, in order to forum shop the case. During this transfer, HOLLI's counterclaim disappeared from the court's file and in it's place was inserted the original counterclaim submitted by KELLI on or about June 6, 2002.

**(xxiii).** When the case arrived in Peuler's court, Judge Sandra Pueler rejected jurisdiction of the case because HOLLI's counter-suit exceeded the money jurisdiction of Peuler's Court. After Pueler's order was entered, NAR's counsel again checked out the court file after which HOLLI's First Amended Counterclaim disappeared. In its place was inserted the original counterclaim submitted by KELLI in June of 2002 and stolen from the Court's file by NAR's counsel. The case was then assigned to Quinn's court in September of 2002. Once again, NAR successfully procured a docket clerk to alter the docket record to reflect that a counterclaim had been filed into the reconstructed docket and court record and not a First Amended Counterclaim.

**(xxiv).** One month after bate switching HOLLI's First Amended Complaint with KELLI's original counterclaim, NAR's counsel filed summary judgment papers against Kelli's original counterclaim.

**(xxv).** HOLLI subsequently appeared at Judge Quinn's clerk's office and complained about the criminal misconduct by NAR's attorneys. Judge Quinn's clerk after speaking to Judge Quinn, informed HOLLI that the case was proceeding against Kelli because Kelli's counterclaim was of record and NAR had already filed dispositive papers precluding HOLLI's right to proceed on the assigned claims. HOLLI filed criminal charges with the Utah Attorney General's office against NAR's counsel, Judge Quinn and Judge Fratto.

**(xxvi).** In the interim, Judge Quinn conducted an expedited summary judgment hearing ordering Kelli to appear and defend WITHOUT COUNSEL. On November 25, 2002, KELLI did appear and complain that she no longer owned the claims based on assignment to HOLLI and that KELLI was entitled to counsel in order to argue the illegal actions of the opposing parties and the court. Judge Quinn deemed Kelli's jurisdictional objections as a consent to granting NAR's summary judgment motion on all claims presented in Kelli's original counterclaim. No written

order had been prepared.

**(xxvii).** On December 2, 2002, HOLLI's complaint with the Utah AG's office had reached Judge Quinn's office. Judge Quinn's clerk contacted HOLLI and directed HOLLI to file another First Amended Complaint and another set of assignment documents with his court and he would let HOLLI intervene on the case as a matter of right.

**(xxviii).** On December 6, 2002, HOLLI did file another set of the foregoing documents and a motion to intervene with QUINN's court. After the required time period had passed, HOLLI in accordance with the procedural rules of the state of Utah, submitted notices to submit for decision. When Judge Quinn failed to address HOLLI's repeated notices to submit for decision as promised, HOLLI filed a mandamus writ against Judge Quinn with the Utah Supreme Court on January 13, 2003 pursuant to authorized authority **BARNARD v. MURPHY, 852 P.2d 1023 (Utah App. 1993) PER CURIAM**: (Held: "This matter is before the court on a petition for extraordinary writ in the nature of mandamus to compel compliance with procedural rules, specifically to address Bernard's numerous notices to submit moving judge Murphy to act on Barnard's filings. Barnard's contention was that Judge Murphy had improperly delayed action on his filings, in spite of numerous notices to submit for decision and thereby delayed adjudication and disposition of pending matters before the court in violation of URCP rule 1. We grant Barnard's petition for mandamus."

**(xxix).** In response to HOLLI's served mandamus petition, Judge Quinn entered a final order on February 13, 2003 joining HOLLI to the state litigation and dismissing HOLLI's counterclaims with prejudice - without any opportunity accorded to HOLLI to even appear and argue her assigned claims before the court. 27 See exhibit "12" attached for this final judgment.

**(xxx).** Subsequent thereto, HOLLI timely filed a rule 59/60(b) motion seeking to vacate the 2/13/03 final judgment on due process grounds. HOLLI also

---

27. See also **Foster v. City of Lake Jackson, 28 F.3d 425, 430 (5th Cir.1994)** ("the right of access is implicated where the ability to prosecute a suit is delayed, or blocked altogether.") Irrespective that Quinn's order was procedurally illegal, it nevertheless mooted HOLLI's writ petition pending before the Utah Supreme Court.

**(xxx).** Subsequent thereto, HOLLI timely filed a rule 59 motion seeking to vacate the 2/13/03 final judgment on due process grounds. HOLLI also filed chapter 13 bankruptcy which subjected this litigation to the automatic stay of the bankruptcy code. HOLLI later removed this state action to the bankruptcy court for all further dispositions. At the time of removal, no decision had been made on HOLLI's rule 59 motion.

**(xxxi).** On March 28, 2003, HOLLI filed a motion to dismiss the Writ action on the basis that it was mooted by Judge Quinn's 2/13/2003 final judgment and because the bankruptcy court would be deciding all further matters. See Holli's motion to dismiss as exhibit "13" attached.

**(xxxii).** On April 3, 2003, without notice to HOLLI that the Utah Supreme Court was considering contempt matters against her, without any opportunity to respond to any contempt matter, in violation of the automatic stay and bankruptcy removal statutes, and without subject matter jurisdiction over a live controversy, the Utah Supreme Court entered a criminal/civil contempt judgment against HOLLI in violation of Holli's due process rights under the 14th and 5th Amendments; thus rendering the Utah Supreme Court contempt judgment a legal nullity. 28 (See exhibit "14" attached Utah Supreme Court Contempt Judgment.)

---

28. See **Collins v. Kegans, 802 S.W.2d 702, 705 (Tex. Crim. App. 1991)** (where the contempt order was not the product of due process, it is void.); **Ex parte Gordon, 584 S.W.2d 686, 688 (Tex. 1979).** "An order is void if it deprives the applicant of liberties without due process of law." **Ex parte Swate, 922 S.W.2d 122, 124 (Tex. 1996).** See also **Borkowski v. Abood, 861 N.E.2d 872, 169 Ohio App. 3d 31, 2006 Ohio 4913 (Ohio App., 2006)** (Borkowski had removed his state litigation to the federal court. In spite of constructive notice of this removal, the state judge entered a judgment on the removed complaint against Borkowski. Borkowski sued the state judge for acting in clear absence of subject matter jurisdiction. Borkowski's suit was dismissed by a trial judge. Borkowski appealed. The appellate court held: "where a judge knows that he lacks jurisdiction, or acts in the face of clearly valid statutes or case law expressly depriving him of jurisdiction; the judge's actions are taken in clear absence of jurisdiction and, as a result, judicial immunity will be lost" citing **Rankin v. Howard (C.A.9, 1980), 633 F.2d 844, 849.** The Borkowski court concluded that the state judge acted in the clear absence of jurisdiction, rather than in excess of his jurisdiction when he ruled on matter which had been removed from his court. The judge was stripped of his judicial immunity. Finally, see **Alfonso v. Skadden, 251 S.W.3d 52, 55 (Tex. 2008) (per curiam)** ("The presumption supporting judgments does not apply when the record affirmatively reveals a jurisdictional defect . . . ."), cert. denied, 129 S. Ct. 402, 172 L. Ed. 2D

**(xxxiii).** After HOLLI removed the matter to the bankruptcy court, HOLLI submitted an attack on the void Utah Supreme Court contempt judgment based on the legal grounds set forth in exhibit "15" attached hereto. HOLLI's removed action was assigned to judge Dee Benson, friends to the Utah Supreme Court judge that entered the contempt judgment against HOLLI. Judge Dee Benson dismissed HOLLI's removed case against the NAR litigants based on lack of residual subject matter jurisdiction when HOLLI's main bankruptcy case was improperly dismissed. See exhibit "76" attached for generic dismissal order. The NAR litigation was never remanded back to the state court leaving any future litigation to proceed in the federal forum.

**(xxxiv).** After the bankruptcy dismissal order, the NAR litigants reported the judgments against HOLLI's credit report and knowingly published the VOID Utah Supreme Court Contempt Judgment on the internet causing HOLLI significant commercial and personal reputatiional damages. As alleged infra, the Idaho litigation was also obstructed by a financially conflicted judge. HOLLI requests that the US Attorney General be directed to investigate into charges.

## C. Defendant Dee Benson's July 8, 2004 Contempt Judgment

(i) One year after Judge Benson dismissed HOLLI's litigation against the NAR litigants on jurisdictional grounds, and without having any matter concerning HOLLI pending before Judge Benson's court, Judge Benson colluded with his friend Utah Supreme Court Judge Christine Durham - to self initiate a case against HOLLI and enter a retaliatory contempt judgment against HOLLI on July 8, 2004 "in closed chambers", ex parte, and without any notice to appear and defend. ( The order falsely asserted that an OSC was issued to HOLLI. In fact there is no record of any OSC having been issued to HOLLI). Judge Benson's contempt judgment was in

---

286 (2008). Also see **Marketing On Hold, Inc .v. Wallace B. Jefferson, et al. twelves justices of the Texas Supreme Court in their official capacities, Case #: 1:10-cv-00104-SS, W. D. Texas (February 10, 2010)** (Supreme Court justices are not protected from declaratory and injunctive relief when their actions result in an ongoing violation of constitutional rights).

violations of common law rules of the Supreme Court which held that a federal court lacks subject matter jurisdiction over any petition which is brought solely under the All Writs Act. 29 In addition, Judge Benson condoned the forgery of process in HOLLI's name by other litigants when Judge Benson opened up a case in HOLLI's name and then filed his contempt judgment as the initiating petition.

**(ii).** Judge Benson's contempt judgment is found at exhibit "17" attached. The contempt judgment was entered on July 8, 2004 as indicated by Benson's signature thereon. The contempt judgment states that an OSC was served upon HOLLI regarding the contempt matter. In fact HOLLI never received service of any contempt matter by BENSON. In HOLLI's case, HOLLI was never served with any OSC re Dee Benson's contempt order. 29

**(iii).** Benson self initiated a case 8 months later as USDC Utah case no. 2:05-CV- 253 and illegally filed his contempt judgment as HOLLI's initiating petition. Judge Benson then asserted that HOLLI had opened the case under the All Writs Act which purported to empower judge Benson to enter an 8 month old contempt judgment. Attached hereto as exhibit "18" is the case summary Benson ordered the clerk to process and which shows that the case was purportedly opened by HOLLI, under federal question jurisdiction via the All Writs Act, and HOLLI demanded $ 0 damages.

**(iv).** HOLLI searched the file to find the OSC that she was never served. There was a complete absence of any OSC in the file thus proving HOLLI's assertion that Benson lacked both subject matter and personal jurisdiction to enter the contempt judgment against HOLLI. 30

---

29. See **Syngenta Crop Protection, Inc v. Henson, 537 U.S. 28, 33, 123 S Ct 366, 369-70 (2002)** (hold: "The All Writs Acts independently does not provide a jurisdictional basis for a federal question case.) Followed in **Morris v. T.E. Marine Corp., 344 F.3d 439 (5th Cir. 2003); U.S. v. Raheman, 355 F.3d 40 (1st Cir. 2004)**(no subject matter jurisdiction in federal court unless plaintiff's complaint (emphasis added) states another federal claim outside the All Writs Act.) ; **Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S Ct 1601, 1608, 60 L Ed.2d 66 (1979)** (Plaintiff must present a petition to the court that present a justiciable federal question on the face of Plaintiff's complaint, before an article III judge may acquire jurisdiction.); Stockyards Nat. Bank of So. Omaha v. Bragg et al., 67 Utah 60, 246 P. 966 (Utah 1925) (It is fundamental that a petition or pleading of some kind is the juridicial means of investing a court with jurisdiction of subject matter. Where a judgment is obtained at variance with the well recongnized principles and procedural rules, the judgment is void and must be set aside.).

30. "Jurisdiction requires that three essentials must be present: authority over the

(v). In addition to the procedural defects of Benson's order, the factual content was wholly false. Only one court had invalidly found that HOLLI's cases lacked merit and that was the void Utah Supreme Court contempt judgment upon which Judge Benson predicated his contempt judgment; thus grounding another reason to find Benson's contempt judgment void because it was predicated upon another void contempt judgment. 31

(vi). After Judge Benson opened this federal action, the NAR litigants filed Benson's contempt judgment in the Idaho federal action HOLLI filed against the NAR defendants. At the unlawfully convened criminal contempt trial conducted by judge TALLMAN, HOLLI submitted a legal brief to TALLMAN which attacked the legal competency of BENSON's contempt judgment. This brief is found at exhibit "19" attached hereto and alleged that BENSON's contempt judgment was void on the following grounds: (1) failed subject matter jurisdiction under the sole cause of action i.e. the All Writs Act; (2) petition defects because HOLLI did not file any petition raising any case or controversy with Benson's court; (3) failed personal jurisdiction because HOLLI was never served with any OSC to give notice of any contempt proceeding, and; (4) failed due process because HOLLI was never given an

---

subject matter, authority over the person, and the power to proceed to judgment." **Fairfield, 610 S.W.2d at 779; Emery v. State, 57 Tex.Crim. 423, 123 S.W. 133, 134 (1909).** "If the court lacks any of the essential elements of jurisdiction, any judgment by it is void and unenforceable." See **Emery, 123 S.W. At 134. Compare Skillem v. State, 890 S.W.2d 849, 859 (Tex.App. 1994).** In **Ex Parte Acevedo, No. 13-05-725-CR (Tex. App. 11/9/2006) (Tex. App., 2006)**, the Texas appellate courts held that the contempt order issued against Acevedo was void because Acevedo was not **personally served** [emphasis added] with the show cause citation and therefore was not afforded adequate due process. The deputy in this case testified that the show cause notice was served on one of Acevedo's staff members and not personally served on Acevedo. Substituted service may not be employed in contempt proceedings. The Acevedo Court decreed the contempt order void and vacated it for procedural due process violations. See also **Blackburn v. United States Parole Borad, 429 F.2d 364 (5th Cir. 1970)** (If statutory or constitutional rights have been denied, then due process has been violated, the resulting judgment is void and must be vacated by a registration court); Accord in Boddie v. Weakley, 4 Cir. 1966, 356 F.2d 242 .

31. See **V.T.A. Inc. v. Airco, Inc., 597 F.2d 220, 224 (10th Cir. 1979)** (Citing 11 Charles Alan Wright, Arther R. Miller & Mary Kay Kane, Federal Practice And Procedure section 2862 (2nd ed. 1995), if the underlying judgment was void, any order based on the underlying judgment is equally void and cannot be given credit. Additionally the judgment must be vacated if void.

opportunity to respond to the contempt matter which was entered ex parte against her.

### D. Los Angeles Homeowners Aid's Case USDC-Idaho No. 05-CV-126 Was Determined By A Utah Court Not To Involve Any Form Of Servce Fraud

#### (1) HOLLI Was Collaterally Prosecuted In Utah For Los Angeles Homeowner's Aid's Alleged Service Fraud Allegations Referred To In Tallman's Contempt Judgment

**(i).** To obstruct prosecution of the Idaho action, the NAR and other tort defendants in HOLLI's lawsuits, all asserted that HOLLI operated under the name of several aliases, i.e. Marti Telford and Kelli Lundahl and should be prosecuted for criminal impersonation. The NAR litigant's also fraudulently asserted that HOLLI did not have an Idaho residence and therefore was criminally attempting to obtain jurisdiction in Idaho.

**(ii).** In opposition, Holli provided a certified copy of her Idaho residence deed, Idaho ID, pictures of her home and a letter confirming power to her Idho home to TALLMAN. See exhibits "22", "29" and "56" attached for these documents. MARTI had just been in a serious car accident and was in a coma, so HOLLI provided TALLMAN with a letter from the critical care doctor at the hospital admitting that MARTI was a real person and in a coma. HOLLI also provided TALLMAN with an affidavit by Kelli asserting that Kelli was not HOLLI and that KELLI had assigned all rights in her claims to HOLLI in July of 2002.

**(iii).** While the foregoing prospective criminal contempt proceeding was pending before TALLMAN's court, complaining witness Los Angeles Homeowners Aid filed a criminal complaint against HOLLI in a Utah state court asserting that HOLLI engaged in service fraud in Idaho federal case no. 05-126 - by filing service declarations which had affixed thereto forged bank notaries for the purpose of authenticating non-existent process servers. 32 (See Tallman's contempt judgment as exhibit "23" attached, page 5, column 1, para. 1, for Judge Tallman's reference to Los Angeles Homeowners Aid's service fraud allegations against HOLLI.) The NAR

litigants joined that criminal prosecution.

### (2) HOLLI Won The State Criminal Prosecution Brought By Los Angeles Homeowners Aid, Inc. And NAR Inc.

**(i).** HOLLI won the criminal contempt trial procured by Los Angeles Homeowners Aid in Utah. The judge withdrew the matter from a jury and ruled that Holli did not forge Chavarin's or any other bank's notary's signatures to any declarations and Keddington did not alter the filing stamp on his Notice of Change Of Address. (See exhibit "34" attached for the relevant part of the court's ruling and the court docket showing that the bank notaries testified.) (Also see Chavarin's and Gottfredson's 302 FBI reports as exhibit "79" attached hereto admitting to this state criminal prosecution which took place in the context of a civil case filed by Los Angeles Homeowners Aid, Inc.)

**(ii).** During the prosecution of this criminal action, it was learned that FBI officer Lance Edwards had complained to the Utah Court and to TALLMAN's court that HOLLI frequently engaged in service fraud. A 302 FBI report was submitted by EDWARDS wherein EDWARDS admitted to "taking HOLLI down" during a service performed upon EDWARDS in October of 2000. HOLLI's service videotape was seized by EDWARDS at the time of service and then altered by removing the assault upon HOLLI's person by FBI officers - which HOLLI filmed during the service. HOLLI

32. Remarkably, HOLLI had always argued that any dispute with respect to service of process on a tort defendant was required to be decided by a jury given HOLLI's cases involved jury demands. The Texas courts directly addressed Holli's challenge in **Caldwell v. Barnes, 154 S.W.3d 93 (Tex., 2004)** (We conclude that the plaintiff was entitled to submit the question of service to a jury at trial and the trial court erred by resolving the matter in a pretrial hearing. **Legal conclusions**: Proof of non-service will conclusively establish the only element that bill of review plaintiffs are required to prove when they are asserting lack of service of process as their only defense. Defenses when disputed are properly resolved at trial by a jury and not by the trial court in a pretrial proceeding. When a party timely demands a jury trial, the trial court may not remove the case from the jury docket. *See* Tex.R. Civ. P. 216, 220; ***Mercedes-Benz Credit Corp. v. Rhyne,*** 925 S.W.2d 664, 667 (Tex.1996). The wrongful denial of a jury trial is harmful when the case contains a question of material fact. *Rhyne,* 925 S.W.2d at 666. The question of whether Caldwell was served with process is a question of material fact, and therefore the denial of a jury trial was harmful error.) TALLMAN should have submitted the complaining witnesses' false claims that HOLLI did not serve process on them, to a jury.

filed an action against EDWARDS in 2000, but this action like HOLLI's other actions, was summarily dismissed for lack of residual subject matter jurisdiction after HOLLI's main bankruptcy case was dismissed. (Refer back to exhibit "76" attached for generic dismissal judgment.) Judge Benson was assigned to the 2000 case against EDWARDS and refused to order an forensic examination of the service videotape HOLLI charged had been altered by the FBI and EDWARDS to protect these defendants. 33

**E. After The Complaining Witnesses Lost In other Forums, They Procured TALLMAN To Irregularly Conduct A Criminal Contempt Trial In TALLMAN's Court With TALLMAN Sitting As A Financially Conflicted Judge And Acting As The Judge, Jury And Executioner Of Criminal Charges Against HOLLI In Order to Forever Bar HOLLI From Pursuing Any Of Her Claims Against the Complaining Witnesses**

**(1) TALLMAN In Violation of The Canon of Ethics For Judicial Officers Initiated and Conducted A Criminal Contempt Trial Against HOLLI**

(i) Tallman illegally convened a criminal contempt trial against LUNDAHL without going through the normal procedures for conducting a criminal trial in violation of the Cannon of ethics for judicial officials and which the Florida Supreme Court has found will justify criminal sanctions against a judge. See exhibit "77-1" and "77-2" attached for Florida Judicial Commission's judgments against judges improperly

33. In Texas, when government officials falsify reports and conceal exculpitory evidence to cover up crimes committed by others, the government officials are liable under RICO for witness tampering and obstruction of justice. See **Labarbara v. Angel, 95 F.Supp. 2d 656 (E. D. Tex., 2000):** The defendants engaged in a profound scheme of witness tampering to avoid civil liability. Plaintiff Labarbara alleged the defendants committed several RICO violations punishable by a term of imprisonment of not more than 20 years. § 12.33 TEX. PEN. CODE. Labarbara asserted that the police chief Winder filed a false accident report in violation of 1962(a), (b) and (d). Specifically, Labarbara's son was killed by the football coach while the coach was driving under the influence. The police in charge of the investigation and under Winder's control, immediately engaged in a cover up by not interviewing critical witnesses, failing to record relevant physical evidence, conspiring with the Doctor at the hospital to cancel Coach Pearce's blood-alcohol tests in violation of emergency room protocols and Police Department policy, and subsequently filing a false accident report indicating: that Brian LaBarbara was at fault for the accident, that Pearce took evasive action with his vehicle, and that a false witness observed the event.

prosecuting criminal contempt actions.

**(ii).** TALLMAN sat on each of the five unrelated cases that HOLLI filed in Idaho and referenced in TALLMAN'S criminal contempt judgment. A jury trial was demanded in every one of those cases. TALLMAN decided disputed service of process issues without looking at HOLLI's service videotapes and in spite of HOLLI's repeated demands that a jury decide any disputed service issues in her cases. TALLMAN's actions violated the rulings of the Texas Supreme Court in **Caldwell** supra. 34 TALLMAN then elected to conduct a criminal contempt trial against HOLLI himself - for service fraud and other litigation related fraud.

**(iii)** From April 15, 2006 to May 8, 2006, intervening complaining witnesses comprising of tort defendants in Holli's cases appeared before TALLMAN's court and filed contempt affidavits against HOLLI accusing HOLLI of fabricating evidence, false swearing, forgery, perjury and service fraud. (See exhibit "23" attached at page 5.) After these criminal accusations were filed against HOLLI, it was incumbent upon TALLMAN to properly notice HOLLI that TALLMAN was conducting a criminal contempt trial against HOLLI. Under the sixth amendment a grand jury was required to indict HOLLI given the infamous nature of the charges. 35 No such indictment was issued in TALLMAN's court.

**(iv).** On May 15, 2006, Judge TALLMAN conducted a 90 minute criminal contempt hearing on the complaining witnesses felony charges. HOLLI objected to TALLMAN conducting a criminal contempt trial without imposing the proper criminal procedures which included: presentment of the charges by an indictment; the right to shadow counsel to aid in her defense; the right to confront witnesses; the right to a jury trial, and; the right to be found guilty beyond reasonable doubt. 36

---

34. Idaho also affirms the legal conclusion that plaintiff is entitled to a jury trial on disputed jurisdictional issues in **Full Circle, Inc. v. Schelling, 108 Idaho 634, 701 P.2d 254 (Idaho App., 1985).**

35. See **Boylan v. Detrio, 187 F.2d 375 (5th Cir. 1951)** (accusations against the defendants of obstruction of justice by committing false swearing, perjury and other crimes, must be prosecuted as criminal contempt.) Accord in **Hendrix v. Consolidated Van Lines, Inc., 1954, 176 Kan. 101, 269 P.2d 435, 441.**

36. See **Bloom, 88 S.Ct. At 1481-1482, n. 3 (1989)** ("Convictions for criminal contempt are indistinguishable from ordinary criminal convictions".). The Fifth Amendment

**(v).** During the hearing, HOLLI also demanded that TALLMAN recuse himself because TALLMAN owned upwards of nearly $1.2 million stock interests in the complaining witnesses' companies. Finally, HOLLI vigorously denied guilt of the felony accusations and asserted that the court was in possession of the exculpitory evidence proving the criminal accusations were false and lacked probable cause. Holli supplemented TALLMAN's record with her exculpitory evidence above referenced and as attached to this complaint.

**(vi).** Aside for the cases cited supra in which HOLLI won all criminal proceedings properly instituted against her, TALLMAN raised two other cases in which HOLLI had criminally abused the process by forcing the tort defendants to expend monies to defend against HOLLI's alleged abusive claims, to wit: Christonson v. US, USDC-Idaho case no. 05-CV-145 and Hurst v. Carney, USDC-Idaho case no. 05-CV-459.

**(vii).** In Christonson, Magistrate Micheals corruptly reported that HOLLI had litigated the same claims in the Utah Court system. Attached hereto as exhibit "31" is the appellate court docket in the Compton/Christonson case. This record shows that the 10th Circuit Appellate panel obstructed HOLLI's right to appeal that

---

guarantees, "(n)o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury". This provision was designed "to provide a fair method for instituting criminal proceedings," **Costello v. United States, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397, 402 (1956).** Accord in U.S. v. Cosby, 601 F.2d 754 (C.A.5 (Ga.), 1979) ("A defendant is only required to answer for an infamous crime pursuant to an indictment or by information of the prosecutor.) **TEX. CONST. art. V, § 12(b). Duron v. State, 956 S.W.2d 547, 549 (Tex.Crim.App.1997), and National Life Co. v. Rice, 140 Tex. 315, 167 S.W.2d 1021, 1024-25 (1943).** A defendant charged with criminal contempt enjoys the presumption of innocence, must be proved guilty beyond a reasonable doubt; cannot be compelled to testify against himself, Gompers, 31 S.Ct. At 499; has the right to counsel, Bloom, 88 S.Ct. At 1484, and if the charge is one which if convicted could result in a maximum imprisonment period exceeding 1 year, is entitled to a trial by jury. Frank v. United States, 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969). Furthermore, neither a single judge or a group of judges: (1) can act as the trier of fact when the charge is an infamous crime, **Codispoti v. Pennsylvania, 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974);** Michaelson v. United States, 266 U.S. 42, 45 S.Ct. 18, 19, 69 L.Ed. 162 (1924); (2) can act as a prosecutor in a serious criminal proceeding, **United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947);** and (3) must refer serious criminal contempts to the US Attorneys office for initiating criminal prosecutions as required by the Separation of Powers Doctrine. **Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 52 S.Ct. 238, 240, 76 L.Ed. 389 (1932).**

case by dismissing HOLLI's appeal because HOLLI complained about financial interests in the sitting appellate tribunal who owned upwards of $3 million in stock interests in the appellee parties in that appeal case. Refer back to exhibit "77-4" attached hereto @ pg. 7, "In re McMIllan", wherein a judge was sanctioned for acting on a case wherein he was disqualified on actual bias grounds. As the docket record at exhibit "31" attached further shows, HOLLI also filed a motion for rehearing en banc demanding an impartial appellate panel reinstate her appeal and hear her appeal on its merits. The biased 10th Circuit panel shelved HOLLI's motion for rehearing en banc and never ruled upon it reportedly because the 10th Circuit could not convene an impartial 3 judge panel. Accordingly HOLLI was denied the right to appeal the wrongful decision of the trial court dismissing 2 of HOLLI's substantive claims as time barred because of a corrupt failure to apply Utah's Savings statute. The denial of HOLLI's right to an appeal precluded the application of res judicata. 37 Hence Magistrate Micheal's judgment finding HOLLI's RICO and ACCESS claims filed in Idaho barred under the doctrine of res judicata was clearly a violation of due process.

**(viii).** With respect to the Hust v. Carney case, USDC-Idaho no. 05-CV-459, TALLMAN corruptly stepped into that undisputed theft case and dismissed that case with prejudice because he ruled that HOLLI did not timely file a response to the appearing defendants motion to dismiss when the record shows that HOLLI did timely respond pursuant to a Magistrate's order extending HOLLI's response time. It is clear that TALLMAN corruptly violated HOLLI's rights on so many levels, that the Attorney General should investigate into TALLMAN's misconduct and direct the Office of Public

---

37. See **In re Pickering, 182 B.R. 268 (Bankr.Mont., 1995)** (to apply res judicata the parties must be fully heard, the court must support its decision with a well reasoned opinion, and **the decision must have been subject to an appeal or in fact reviewed on appeal.** Citing Restatement (Second) of Judgments § 13 comment g (1982)). Under the doctrine of res judicata, a final judgment on the merits rendered by a court of competent jurisdiction, without fraud or collusion, is conclusive as to the rights of the parties and their privies. Griggs v. Griggs, 214 S.C. 177, 51 S.E.2d 622 (1949). See **Prostok v. TWC Special Credits, et al. case no. 03-0784 Texas Supreme Court (2005)** (" Fraud is, and has been for a long time, an exception to virtually every known legal doctrine including the doctrine of res judicata). *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "A supervisory official, after learning of the violation through a report or appeal, and who fails to remedy the wrong, creates a policy under which unconstitutional practices occur, or allows the policy or custom to continue." Larkins v. Oswald, 510 F.2d 583, 589 (2d Cir. 1975).

Integrity to prosecute. While HOLLI is aware that she cannot sue the AG and compel a criminal prosecution, she is also aware that she can sue the AG HOLDER to compel an investigation into criminal acts and for a declaratory judgment that admits that TALLMAN'S contempt judgment judgment clearly violates HOLLI's future constitutional rights, and that TALLMANS' past judgments and actions created backward access claims for HOLLI.

(ix). As above stated, on May 24, 2006, TALLMAN entered a criminal contempt judgment against HOLLI, MARTI and others associated with HOLLI. Refer back to exhibit "23" attached. TALLMAN's contempt judgment was criminal because: (a) TALLMAN accused HOLLI and alleged aliases of committing numerous felony acts, (b) the whole of TALLMAN's contempt judgment punished HOLLI and alleged aliases solely for past acts, (c) TALLMAN claimed to have entered the judgment to protect the dignity and integrity of the court's processes, and (d) TALLMAN ordered HOLLI to pay a fine to the court for filing papers which attacked the competency of TALLMAN's contempt judgment. 38

**(xi).** On August 1, 2006, Judge Tallman terminated USDC-Idaho case no. 05-CV-127. On August 3, 2006, HOLLI filed a timely rule 59 objection to judge Tallman's final and interlocutory orders. See exhibit "24" attached for HOLLI's attack

38. See **Walling v. Crane, 158 F.2d 80, 83 (5th Cir. 1946)** (Judgment that carries traits of both criminal and civil contempt is controlled by its criminal nature and constitutes a criminal contempt judgment). **In re Dinnan, 625 F.2d 1146 (5th Cir. 1980)** (when criminal contempt judgment fails to employ criminal procedures, the judgment cannot stand.) Accord In re Monroe, 532 F.2d 424 (5th Cir. 1976); Samuel Gompers v. Buck Stove Range Company, 221 U.S. 4 18, 31 S.Ct. 492, 55 L.Ed. 797 (1911) (Judgment is criminal when contempt punishes past acts.) See **Green v. United States, 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672 (1958)** (Criminal contempt where the alleged contempt is also a violation of a federal criminal statute. As Mr. Justice Holmes irrefutably observed for the Court in **Gompers v. United States, 233 U.S. 604, at pages 610–611, 34 S.Ct. 693, at page 695, 58 L.Ed. 1115**: 'These contempts carry the criminal hallmark because they are infractions of the criminal law. They require the protection of criminal procedures.). Imprisonment period exceeding six months, require a jury trial. Frank v. United States, 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969); Codispoti v. Pennsylvania, 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974). See also United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947) (Court cannot act as a prosecutor or jury in deciding criminal matter). Where a court elects to address a criminal contempt matter, he must refer the matter to the US Attorneys office who is responsible for initiating criminal prosecutions under the Separation of Powers Doctrine.

on Judge Tallman's final orders. Judge Tallman summarily denied HOLLI's rule 59 attack without exposition and HOLLI timely appealed.

**(xii).** Judge Tallman subsequently acted as a complaining witness - along with the other complaining witnesses intervening in the NAR litigation - and charged HOLLI with perjury crimes to address the fabrication of evidence charges asserted in TALLMAN's contempt order @ page 6 of 8. HOLLI was seized on TALLMAN's and others criminal charges two months later and kept in jail for more than 2½ years until the false criminal charges were disposed in HOLLI's favor.

**(xiii).** After HOLLI was incarcerated, HOLLI was locked down as a super max inmate to prevent HOLLI from engaging in any litigation activities. 39 The respective appellate courts dismissed HOLLI's appeals filed in the Idaho federal cases for failure to prosecute.

**(xiv).** In 2007 and 2008, HOLLI mailed writs of Habeas Corpus to the Texas federal courts based on her defenses of vindictive prosecution and failure to state a criminal offense. Texas prison personnel were instructed to hold HOLLI's writs until HOLLI was transferred from the state of Texas back to Utah for the sole purpose of obstructing jurisdiction over HOLLI's Habeas Writs in the state of Texas. 40 Accordingly, three Habeas Corpus/ mandamus writs were filed and summarily dismissed as moot in the Texas federal court system.

**(xv).** Finally on January 21, 2009, the criminal charges were dismissed pursuant to the governments motion. See exhibit "27" attached for dismissal judgment. HOLLI was subsequently released 1 and ½ months later from the state of Texas. The US AG should investigate into HOLLI's retaliatory incarceration issues.

---

39. See Tate v. Wood, 963 F.2d 20, 26 (2nd Cir. 1992) (form of extortion and due process violation to keep a pro se litigant confined in administrative segregation for entire period of criminal proceedings because defendant was prevented from any opportunity to prepare own defense in criminal case or to litigate other civil matters relative to the imprisonment.); Milton v. Morris, 767 F.2d 1443 (9th Cir. 1985)(right of access violated when prison authorities denied defendant meaningful access to the telephone, visits, law library, research materials, or writing materials to present a defense). Accord in People v. Lamon, F051924 (Cal. App. 2009)

40. The Utah Criminal judge ordered the clerks not to file or lodge anything in HOLLI's name because of HOLLI's alleged abusive litigation history advanced by TALLMAN; thus obstructing HOLLI's constitutional right to challenge her detention.

**(xvi).** While HOLLI was in jail, HOLLI's Idaho home was gutted and IDOT took almost two acres of HOLLI's property which bordered the I-15 freeway, without notice or any compensation to HOLLI. Other DOES individuals gutted HOLLI's Idaho residence.

## F. FBI Officials Conspired With TALLMAN, IDOT And Unknown Does Persons To Gut and Take HOLLI's IDAHO Property To Punish HOLLI For Exposing Official Corruption In IDAHO

**(i).** While HOLLI was in jail for more than 2 ½ years, FBI officials in conspiracy with TALLMAN schemed with IDOT to take 2 acres of HOLLI's Idaho property without notice and without any compensation whatsoever to HOLLI.

**(ii).** In addition as disclosed during HOLLI's criminal trial, FBI officials contacted members of HOLLI's local community and informed those contacts that HOLLI was in jail and would never be released.

**(iii).** Moreover, the prosecutor made it known to the public attending HOLLI's criminal trial that: (a) HOLLI resided alone in her Idaho home, (b) the government was endeavoring to put HOLLI in jail for 10 years in USDC-Utah case no. 2:07 CR 272, (c) HOLLI could not be released pretrial because HOLLI had a history of witness tampering according to TALLMAN's void criminal contempt judgment, and (d) HOLLI's case was so complex and convoluted that Holli would be in jail for several years before the case was ready to go to trial. The prosecutor's proclamations opened the door for any DOE person to squat on HOLLI's property the whole of this period and to ultimately gut HOLLI's home.

**(iv).** Also, the government was given a copy of HOLLI's homeowners policy and knew that by HOLLI's absence any protection under her policy would be voided. When HOLLI was finally released, she returned to her IDAHO property with others who were familiar with HOLLI's residency, and learned of the RICO and takings violations which were now uninsured as a result of HOLLI's unjustified forced absence.

**(v).** HOLLI now seeks damages against the US and under Bivens Constitutional Torts because HOLLI's unlawful arrest caused HOLLI's properties to be

stolen or taken without due process of law. Based on the foregoing, defendant HOLDER has a duty to investigate in plaintiff's criminal charges against the defendants and to act accordingly.

18. HOLLI alleges against defendant Supervisor ROERDEN that this supervisor locked HOLLI into the hole in 2007 at Carswell Texas' Federal Medical Center immediately after HOLLI complained of interference and complete censorship of emailed and other mailed legal communications to a private attorney in aid of writs of habeas corpus to obtain HOLLI's immediate release. Because HOLLI was thrown in the hole, HOLLI was not able to access the courts and file these writs while she remained in Texas. Furthermore, HOLLI was not provided any hearing, notice of disciplinary infraction or other due process which allowed HOLLI to dispute her illegal classification after ROERDEN ordered HOLLI locked down in the hole.

19. Finally, the defendants collectively violated HOLLI's sixth amendment right to counsel of choice when they froze HOLLI's assets unrelated to any criminal charge for the sole purpose of preventing HOLLI from funding counsel of choice to fight the criminal charges. 41

## 3rd COA: JURISDICTION UNDER THE FEDERAL CIVIL RIGHTS ACT SECTIONS 1983, 1985(2) AND 1986 AND CONSPIRACY

20. Defendants UDOT, IDOT, McDONOUGH, DURHAM, LAYCOCK, LYON, HADFIELD, THOMPSON, CLARK and AMERICAN FORK CITY, all state officials did violate plaintiff's 1st , 5th and 14th amendment rights to access the courts

---

41. See US v. Jones, 160 F.3d 641, 649 (10th Cir. 1998) (due process right not to have assets unrelated to any criminal activity - frozen or otherwise seized so that defendant could obtain qualified counsel of choice). "Right to counsel of choice is violated when the government wrongfully seizes plaintiffs assets to prevent plaintiff from funding counsel of their choice in their defense. See U.S. v. Kaley, 579 F.3d 1246 (11th Cir., 2009) citing to United States v. Bissell, 866 F.2d 1343 (11th Cir.1989 ) (a defendant whose assets are restrained, thus rendering him unable to afford counsel of choice, is denied his sixth amendment right when the assets seized are not the product of any criminal activity. ). Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). See People v. Gzikowski, 32 Cal.3d 580, 589, 186 Cal.Rptr. 339, 651 P.2d 1145 ("there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.... "The right to counsel

without retaliation, to deprivation of property without due process of law and to a takings claims prohibited under the 5th Amendment of the US Constitution.

21. The charges in TALLMAN's criminal contempt order - culminating in the 2007 criminal prosecution - shows that DURHAM engaged in an ongoing unlawful conspiracy to retaliate against LUNDAHL for more than 7 years (and invited others to do the same) through the implementation of a void contempt order laced with false facts and issued in retaliation to HOLLI's efforts to publicly expose corruption of judicial offices by colluding attorneys in the state of Utah. This action sues DURHAM in her official capacity only for prospective declaratory and injunctive relief to decree DURHAM's order void as a matter of law, order that it be set aside and direct a public renouncement of that contempt order in every conceivable media including the state and federal reporters. 42

---

of choice is such a right. Just as when a court improperly denies a defendant's motion to represent himself Faretta v. California (1975) 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562), or to replace counsel because of a conflict of interest (Holloway v. Arkansas (1978) 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426), or when an indigent criminal defendant is denied counsel altogether (Gideon v. Wainwright (1963) 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799); an indigent criminal's sixth amendment right is violated when the defendant is forced to proceed with an attorney not of his chosing. Chapman v. California (1967) 386 U.S. 18, 23. See **Marketing On Holding Inc. v. Twelve Justices of the Texas Supreme Court, Case no. A10CA104SS (W.D. Tex. 2010)** citing to Will v. Michigan Dept. Of State Police, 491 US 58, 71 & n. 10, 109 S.Ct. 2304, 2312 & n. 10, 105 L.Ed.2d 45 (1989) and **Ex Parte Young, 209 US 123, 28 S.Ct. 441, 52 L.Ed.2d 714 (1908)** for holdings: "The Supreme Court fashioned an exception to sovereign/ 11th amendment immunity. It allowed claims seeking prospective equitable relief to proceed against state officials in their official capacities in federal court in order to prevent ongoing constitutional violations.) **Oladipupo v. Austin, 104 F.Supp.2d 623, 624 (W.D. La. 2000)** (a suit against a federal officer in his official capacity is permitted if (1) the government officer's powers in his official capacity are limited by statute and his actions were ultra vires, or (2) the officer was acting unconstitutionally citing **Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689-90 (1949)).**

42. See **Marketing On Holding Inc. v. Twelve Justices of the Texas Supreme Court, Case no. A10CA104SS (W.D. Tex. 2010)** citing to Will v. Michigan Dept. Of State Police, 491 US 58, 71 & n. 10, 109 S.Ct. 2304, 2312 & n. 10 (1989) and **Ex Parte Young, 209 US 123, 28 S.Ct. 441, 52 L.Ed.2d 714 (1908)** for holdings: "The Supreme Court fashioned an exception to sovereign/ 11th amendment immunity. It allowed claims seeking prospective equitable relief to proceed against state officials in their official capacities in federal court in order to prevent ongoing constitutional violations.) **Oladipupo v. Austin, 104 F.Supp.2d 623, 624 (W.D. La. 2000)** (a suit against a federal officer in his official capacity is permitted if (1) the government officer's powers in his official capacity are limited by statute and his actions were ultra vires, or (2) the officer was acting unconstitutionally citing **Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689-90 (1949)).**

22. Defendant LAYCOCK is sued in her official capacity only for prospective declaratory and injunctive relief to decree the condemnation proceeding brought in her court a sham and order LAYCOCK to immediately dismiss those proceedings based on the fact that the at issue takings took place in 2005 and thereafter - well before the condemnation action was brought in bad faith by actions of Lyons and Clark and subsequent to MARTI's notice to these defendants that the takings had long occurred.

23. Defendants LYON,CLARK, MCDONOUGH, THOMPSON, HADFIELD AMERICAN FORK CITY, UDOT, IDOT and DOES are sued in their official and personal capacities for violating all plaintiff's civil rights; specifically, to be free from deprivation of properties without due process of law and to fair access to the courts. These defendants took MARTI's real properties without just compensation, breached contracts with MARTI in bad faith, stole CHRISTENSEN's security interests secured against MARTI's real properties without notice, and then ludicrously claimed that HOLLI was MARTI in order to use TALLMAN's, BENSON's and DURHAM's illegal and void contempt orders as grounds to cheat plaintiffs of their causes of action, real properties and security interests; all in violation of plaintiff's civil rights.

24. Moreover the defendants conspired with federal officers to obstruct justice and plaintiff HOLLIs civil rights in federal criminal proceedings as proscribed by section 1985(2).

25. Finally, in spite of the fact that several judicial officials and other supervisory officials were aware of the breaches of section 1983 and section 1985(2), no official took efforts to control and stop the conspiracy in violation of section 1986.

26. The facts underlying the takings of plaintiff's real properties are as follows:

27. Commencing in July of 2005, Mid American Energy Holdings company through its subsidiary, invaded plaintiff's property through the installation of primary electrical poles and transformer boxes feeding the entire city. In addition, American Fork City dumped waste water onto MARTI's properties as a go between the city drainage lines and the freeway culvert on the other side of Marti's property; thus causing an ongoing flooding problem. These invasions of MARTI's properties

constituted a taking within the 5th amendment without just compensation. 43

28. The City agreed to compensate TELFORD for the trespasses and takings by dedicating the vacant road to MARTI on the south side of MARTI's property, by relocating the telephones lines, by constructing underground water aqua-ducts and by constructing a foundation for TELFORD to affix her modular home. 44 (See exhibit "80" for the City Mayor's letter committing part of these agreements to a writing.).

29. In July 2009, after receiving MARTI's letter regarding heavy construction equipment occupying MARTI's property and MARTI's repeated request for a time line on completion of the aquaduct system transversing MARTI's properties, the City engineer confirmed to MARTI that albiet the City had constructed and was still constructing aqueduct system to channel water to the freeway culverts on TELFORD's properties, the City had no intention of honoring their contractual agreements with MARTI made in 2005. 44 The engineer subsequently also reported to MARTI that the City had deeded the vacant road to UDOT and that UDOT wanted MARTI's deeded property as well.

---

43. See **U.S. v. Causby, 328 U.S. 256 (1946)** (the Causbys owned a chicken farm beside a municipal airport. The farm was located in the glide path of the airport runway. The Army- engine bomber airplanes flew directly and frequently over the Causby's chicken farm. The noise was deafening and the bright lights from nighttime bomber operations caused as many as six to ten of the chickens per day to kill themselves by flying into the walls from fright. The High Court affirmed that physical invasion of the Causby's property had occurred constituting a taking within the 5th amendment.) "A physical occupation by the government is clearly a taking requiring compensation." See Loretto v. Teleprompter, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

44. **Pearsall v. Richmond Redevelopment and Housing Authority, 242 S.E.2d 228, 218 Va. 892 (Va., 1978)** (Certain affirmative acts of a condemning authority preliminary to the filing of the eminent domain proceeding have spawned litigation in other jurisdictions to determine whether a "taking" in the constitutional sense has occurred prior to the filing. A city may not by deliberate acts reduce the value of private property prior to transfer of title to the property. " **Just compensation to be awarded is determined as of the time of the taking.** White v. State Highway Comm'r, 201 Va. 885, 887, 114 S.E.2d 614, 616 (1960). "A taking can be effected by flooding, or by the saturation of the ground by percolating water. **Pumpelly v. Green Bay and Mississippi Canal Co., 80 U.S. (13 Wall.) 166, 20 L.Ed. 557 (1872);** United States v. Kansas City Life Ins. Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); Manigault v. Springs, 199 U.S. 473, 26 S.Ct. 127, 50 L.Ed. 274 (1905). In Elwood v. Cassese, 136 N.W.2d 896, 376 Mich. 311 (Mich., 1965) the Court opined that "a city may not by deliberate acts reduce the value of private

30. Marti subsequently met with the mayor of American Fork City, Heber Thompson about the former promises of Mayor Ted Barratt and asserted that Thompson had an obligation to honor the former mayor's promises on behalf of the city. 45 Mayor Thompson told Marti that Marti needed to deal with UDOT because the City had deeded the vacant road to UDOT and had no intention of honoring any former commitments to MARTI as a result of UDOT's plans to acquire the properties by condemnation. The Mayor informed MARTI that she would have to procure compensation from UDOT as the successor in interest to American Fork City's formerly vacant properties and any contract issues which attached to those properties. Marti filed an FHA claim against the City of American Fork, Mayor Thompson, the power company and does unknown individuals for discrimination and interference with her housing rights. The administrative claims was served on HUD as the clerk for

---

property and thereby deprive the owner of just compensation." A taking of property occurs "if the action by the government involves a direct interference with or disturbance of property rights." See **R. J. Widen Co. v. United States, 357 F.2d 988, 174 Ct.Cl. 1020 (1966)** (if the defendant officials, by their conduct, should cause properties to be, and to become and to remain, vacant and unoccupied, they are liable to plaintiff for takings claims.) See also In re El Comandante Management Co., LLC, 358 B.R. 1 (Bankr.P.R., 2006) (Deliberate interference with property rights by officials is actionable as a taking claim); United States v. Certain Property in Borough of Manhattan, 403 F.2d 800 (CA 2, 1968) (just compensation means indemnity, measured in money, for the owner's losses, rather than the value of what the taker has gained."). See e.g., Olson v. United States, 292 U.S. 246, 253, 54 S.Ct. 704, 707, 78 L.Ed. 1236; 4 Nichols, Eminent Domain, § 12.41(2), n. 27.

45. See *Port of Mobile v. Watson*, 116 U.S. 289, 305, 6 S.Ct. 398, 405, 29 L.Ed. 620 (1886) (Where there have been prior patterns of discrimination by the occupant of a state executive office but an intervening change in administration, the issuance of prospective coercive relief against the successor to the office will rest against the successor official if that official continues the practices of his predecessor. Any law which leaves no adequate means for the payment of debts is forbidden by the Constitution. The successor must necessarily be held liable. *Spomer v. Littleton*, 414 U.S. 514, 520-22, 94 S.Ct. 685, 688-89, 38 L.Ed.2d 694 (1974) (Plaintiffs entitled to amend complaint to name successor official). See also **Sayre v. United States, 282 F.Supp. 175 (N.D. Ohio, 1967)** (the defendant City refused to repair conditions effecting Sayre's properties * * * [and ] * * by such refusal, caused these properties to be taken by a reduction in value. See also Foster v. Herley, 330 F.2d 87, 89 (6th Cir. 1964) ([T]he City, in causing the threat of condemnation to hang over the plaintiff's property over a period of ten years, was an abuse of the power of eminent domain because the threat deprived the plaintiff of the full use and benefit and the right to ownership of his property and amounted to a taking or damaging of his property without due process of law in violation of his rights under the 14th amendment. A taking of property also occurs when there is a decline in property value by: discouraging improvements ...and by keeping lis pendens in effect for ten years.)

American Fork City.

31. In August of 2009, Marti received a package from UDOT seeking to pay Marti $6200 for the remainder property deeded in Marti's name. Marti contacted Eric Lyon of UDOT and had a heated discussion about: (1) the contract promises which attached to the vacant road and her remainder property, (2) the $40,000 in actual monies Marti had invested in the properties pursuant to the City's fraudulent inducement, (3) the 5 years of trespass and takings torts which attached to the properties and which Marti refused to forebear any longer; (4) the storage fees for her manufactured home that the City was supposed to pay while they constructed the aquaduct system, (5) the loss of use of the property for a home based business which had freeway advertising frontage, and (6) an FHA claim Marti had just filed. Marti accused LYON of attempting to extort her and avoid liability for the City's bad faith breach of prior contracts. Marti asserted that the City nor UDOT was immuned for any conduct involved in a takings scheme without just compensation. Marti also asserted that the super-compensation statute set forth in the Code of Federal regulations authorized UDOT to compensate MARTI for the torts committed against MARTI.

32. The State Judge in spite of lack of subject matter jurisdiction because the act of taking had already occurred against Marti's property thus rendering the condemnation action brought 5 years later as a sham prosecution, usurped her authority and issued an interlocutory order of immediate occupancy to give UDOT,s action credibility. 46 The judge also sought to obtain jurisdiction over MARTI's inverse condemnation claims when no personal service of process had been effected

---

46. Utah State Rd. Comm'n v. Friberg, 687 P.2d 821, 840 (Utah 1984) ( An order of immediate occupancy is entered pendente lite and only authorizes the State to take immediate possession of the property. "[A]n order of immediate occupancy is nothing more than an interlocutory order." State ex rel. Road Commission v. Danielson, 122 Utah 220, 222, 247 P.2d 900, 901 (1952); Utah Copper Co. v. Montana-Bingham Consolidated Mining Co., 69 Utah 423, 436, 255 P. 672, 676 (1926). See also § 78-34-9 (order of immediate occupancy is an interlocutory order only). The State's right to condemn, if challenged, can finally be determined only after a trial on the merits, not at a hearing on the motion for immediate occupancy. State v. Denver & Rio Grande Railroad Co., 8 Utah 2d 236, 238, 332 P.2d 926, 927 (1958).

upon MARTI. 47

33. MARTI refused to negotiate the bond set by the court as just compensation for the real properties UDOT took and stole from MARTI because MARTI adamently contended that the bond order violated the super-compensation rules set forth in the Code of Federal Regulations which pre-empted the state rules for compensation. 48

34. Here, UDOT became the successor at law to the City's contractual promises to TELFORD. UDOT deliberately opened up a condemnation action 5 years later to complete obstruction of the contractual promises made to TELFORD.

35. It is uncontested that UDOT after succession of the properties to them, continued to use the properties for public purposes. UDOT as the successor to American Fork is liable to TELFORD on all contract breaches and other torts which attach to the properties taken from TELFORD.

36. In addition, UDOT completely negated the security interest belonging to CHRISTENSEN and which attached to both properties as a lien thereto. At no time did UDOT serve notice upon CHRISTENSEN that the government was attempting to take and steal her interest or the security collateral thereunder.

37. As to HOLLI, IDOT officials and DOES defendants took 2 acres of HOLLI's IDAHO property without notice or compensation whatsoever to HOLLI knowing that HOLLI was disabled by imprisonment.

---

47. **McGuire v. Sigma Coatings, Inc., 48 F.3d 902 (C.A.5 (La.), 1995)** ( A judgment rendered in the absence of personal jurisdiction is void and must be set aside citing Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind, 841 F.2d 646, 649 (5th Cir.1988) (per curiam)); 2 Moore's Federal Practice p 4.02 at 4-90. To acquire jurisdiction over the person, a court must serve on the person a document, "such as a summons, notice, writ, or order." 2 Moore's Federal Practice p 4.02 at 4-85. In addition, a person waives the defense of defective service if he voluntarily submits himself to the court's jurisdiction by appearing before it and allowing it to adjudicate his rights. Id. p 4.02 at 4-91. Actual notice of the litigation does not satisfy the require-ment of proper service of a summons under Rule 4, Way v. Mueller Brass Co., 840 F.2d 303, 306 (5th Cir.1988). The respondent must be personally served process which addresses the personal rights of that person.

48. See **Redevelopment Agency of Salt Lake City v. Tanner, 740 P.2d 1296 (Utah, 1987)** (A defendant who withdraws the money deposited by the State in support of an order of immediate occupancy pursuant to Utah Code annotated section 78-34-8 shall be held to be an abandonment by such defendant of all defenses.

38. Plaintiffs allege the state actors either conspired with federal authorities and private parties to procure HOLLI's wrongful criminal prosecution to retaliate against HOLLI for exposing corruption of the judicial process, or the state defendants corruptly used federal process to justify stealing plaintiff's properties.

39. Plaintiffs also allege that supervisory authorities had knowledge that plaintiff's civil rights were being violated and did nothing to intervene to protect those rights in violation of 42 USC section 1986.

**4th COA: VIOLATIONS UNDER THE FEDERAL HOUSING ACT AS TO MARTI AGAINST UDOT, MCDONOUGH, CLARK, LYON, THOMPSON, HADFIELD AND AMERICAN FORK CITY IN VIOLATION OF 42 U.S.C. §§ 3604(b), 3605**

40. MARTI alleges that the defendants did discriminate against her based upon her disabilities, sex and economic status and deprived MARTI of a residence within the meaning of the FHA by using federal funds assigned for road development and residential rehabilitation to deprive MARTI of her right to enforcement of contracts to develop her residential property and thereafter by refusing to provide MARTI with freeway property of equal value and equities.

41. "Residential real estate-related transactions" include "the making ... of loans or providing other financial assistance--for purchasing, constructing, improving, repairing, maintaining, or securing a dwelling." 42 U.S.C. § 3605(b)(1). In a seminole case litigating sex discrimination under the FHA against the Secretary of HUD in re Baumgardner v. Secretary, U.S. Dept. of Housing and Urban Development on Behalf of Holley, 960 F.2d 572 (6th Cir. 1992), Baumgardner manipulated the rental of his home to avoid male tenants because of a history by male tenants to damage properties and leave the dwelling unclean and messy. One such prospective renter, Blanton Holley, complained to HUD. After a hearing, an administrative law judge (ALJ) issued a lengthy trial decision on November 15, 1990, which determined that Baumgardner was guilty as charged of intentional discrimination. 42 U.S.C. § 3604 describes, in pertinent part, unlawful acts: (a) To refuse ... to negotiate for the ... rental of, or otherwise make unavailable or deny, a dwelling to any person because of ... sex,

disability.... The Code of Federal Regulations supplements the Federal Housing Act. Title 28 CFR Part 35, section 14.414 provides Non-Discrimination by Public Entities pursuant to Executive Order 12259 of Dec. 31, 1980, 46 FR 1253, 3 CFR, 1980 Comp., p. 307 and outlaws discrimination by public entities because of race, color, religion (creed), sex, national origin or disability... (a) in the sale, leasing, rental, or other disposition of residential property and related facilities (including land to be developed for residential use), or in the use or occupancy thereof, if development of such property for residential use is effected by loans, advances, grants, or contributions agreed to be made by the Federal Government, or (iv) the property is obtained from a State or local public agency receiving federal assistance, and plaintiff assists in improving the property for slum clearance to the benefit of the public.

42. Here the federal government has advanced the state of Utah federal funds to expand the I-15 freeway. Those funds are to be used to justly compensate property owners for the taking of their home and home businesses if applicable for public purposes of improving the interstate transportation system. The defendants have discriminated against TELFORD on the basis of her sex, disability and economic status in the development of her real property for residential use as contracted by the defendants in order to corruptly minimize the federally funded just compensation due MARTI; in violation of the FHA and the Fifth Amendment just compensation clause. In fact the defendants did not even profer ¼ of the of the actual cash investment MARTI placed in the property in 2005.

43. MARTI is entitled to all of the damages allowed by law for violations of the FHA.

## 5th COA: RACKETEERING AND CONSPIRACY TO RACKETEER AGAINST ALL DEFENDANTS EXCEPT TALLMAN, DURHAM, BENSON, LAYCOCK, HOLDER AND THE USA, ALBIET USING THE JUDGE'S OFFICES TO COMMIT RACKETEERING CRIMES

44. The defendants, and all of them, violated and conspired to violate the federal racketeering act whether they be immuned from prosecution or not.

45. Furthermore, the RICO conspiracy herein alleged was a legal and proximate cause of financial harms to plaintiff.

46. The purpose of the conspiracy was to win plaintiff's cases at all costs through a violation of the criminal codes and ethical rules of professional conduct for attorneys and judicial officials.

47. The defendants acchieved their goals in this open ended conspiracy that continues to todays date, by commiting the following predicate acts: (1) mail and wire fraud in perpetration of the criminal accusations leveled against HOLLI on page 5 of the May 24, 2006 criminal contempt judgment; (2) resultant obstruction of justice in five federal district court proceedings administered by TALLMAN and their related appeals; (3) mail and wire fraud and witness tampering through their litigation misconduct; 49 and (4) extortion of plaintiff's causes of action and other assets to the pecuniary disadvantage of plaintiffs. 49

48. Plaintiffs adopt all of the aforestated facts - as if fully set forth herein - as the factual basis for plaintiff's RICO charges. Furthermore, plaintiffs allege that the defendants used offices of the government as their criminal enterprise to effect their RICO violations. Plaintiffs allege in the instant case that these persons did associate in fact to operate a criminal enterprise which committed acts of obstruction of justice, witness tampering, mail fraud, wire fraud, and extortion under color of law for seven years through litigation misconduct and abuses of office. 50

---

49. **U.S. v. Gray, 96 F.3d 769 (C.A.5 (Tex.), 1996)** (The indictment charged numerous RICO and conspiracy counts against members of the mens' basketball coaching staff at Baylor University, and others. The defendants were accused of executing a fraudulent scheme to establish academic eligibility for five transfer students to play basketball at Baylor during the 1993-94 academic year. In its simplest terms, the coaches helped the five players, recruited from two-year colleges, to obtain the credits required for eligibility and possibly scholarships by providing these students with written course work or answers to correspondence exams, which were then sent to the sponsoring schools as the students' work. RICO convictions were sustained under the mail and wire fraud statutes.)
.

50. See **Living Designs Inc. v. E.I. DuPont De Nemours, 431 F.3d 353 (9th Cir. 2003)** (Litigation misconduct is not immuned from a RICO prosecution. Fraud under the mail fraud and obstruction of justice statutes is established when opposing counsel omits information or fabricates documents to obstruct an official proceeding). Also see Clark v. Stipe lawfirm, 320 F.Supp.2d 1207 (W.D. OK 2004) (each proceeding obstructed by the defendant in an overall scheme constitutes a separate act of obstruction of justice.). Also see Deck v.

49. Furthermore, the defendants caused profound damages to plaintiff's professional reputations through publication of the false contempt orders over the internet and other media concerns. 51 The false publications had the foreseeable effect of obstructing plaintiff's inter-coarse in interstate business and ability to enforce contracts - given the conduct of judges to usurp the law and adjudicate that plaintiffs brought frivolous cases and hence were barred from filing present or future cases wholly unrelated to each other. Federal courts have recognized that the publication and enforcement of fraudulently obtained vexatious litigant orders can support RICO and abuse of process claims. 52 Furthermore, it is clear that the stealing of real

---

Engineered Laminates, 349 F.3d 1253 (10th Cir. 2003)(each act of fraud which results in dismissal of a cause of action is remedial under RICO through the mail fraud statute.); GI Goldings v. Baron & Budd, 238 F.Supp.2d 521 (S.D.N.Y. 2002) ("Fixing" evidence, supplying false affidavits, backdating court documents, and falsifying court records to procure settlement of claims states mail fraud, wire fraud and obstruction of justice claims.); Followed in Lockheed Martin v. Boeing, 357 F.Supp.2d 1350 (M.D.Fla 2005) (Giving perjurious testimony, filing false affidavits and destroying evidence is actionable as mail fraud, wire fraud, witness tampering and obstruction of justice. Court offices can act as RICO enterprise.); US v. Triumph Capitol Group, Inc., 260 F.Supp.2d 462 (D.Conn.2002) (corruption of the grand jury process through perjury and submission of false documents actionable under RICO.).

. 51. See **Khurana v. Innovative Health Care Systems, Inc., 130 F.3d 143 (C.A.5 (La.), 1997)** (RICO covers professional reputation damages. Here Dr. Khurana was fraudulently induced to accept employment as a doctor at a hospital via mail and wire fraud. The hospital engaged in a pattern of medicaid and medicare fraud. Khurana's reputation was damaged by association. Khurana sued under RICO. Held: Damage to Khurana's professional reputation is easily seen as a natural outgrowth of an employment association. Predicate acts were responsible for Khurana's accept- ance of his employment with River Region, thus establishing proximate cause. The defendants' racketeering acts also proximately caused Khurana to forego other legitimate business opportunities causing additional damages. Finally, the hiring of Khurana was an overt act taken to effect the conspiracy to commit fraud through Khurana's license. RICO claim established.

. 52. **Rusheen v. Cohen, 128 P.3d 713, 39 Cal.Rptr.3d 516, 37 Cal.4th 1048 (Cal., 2006)** (Here, an attorney for the plaintiff, Cohen, filed a vexatious litigant motion against defendant Rusheen. False proofs of service were filed on the motion. After a hearing, the trial court found Rusheen to be a vexatious litigant when Rusheen did not appear and defend against the motion. The proofs of service signed by a process server declared under penalty of perjury, that the process server had personally served Rusheen with the summons seeking to decree Rusheen a vexatious litigant. Cohen's client later filed the default vexatious litigant judgment in the state of Nevada under the Foreign Judgment Act and began executing on Rusheen's property. Id @ 52. Rusheen sued Cohen for RICO and abuse of process violations and prevailed in his suit.

property from plaintiffs under color of office in not immuned. 53

50. In addition, federal courts have found that when government officials falsify reports and conceal exculpitory evidence, that such conduct will support a RICO prosecution. 54 It is clear in this case that government officials did engage in the foregoing RICO conduct with respect to HOLLI to avoid liaibility to HOLLI for many years. The defendants obstructed justice using their official positions as they did in Labarbara infra.

51. For all of the foregoing reasons, plaintiffs allege that they are entitled to treble damages from the defendants RICO violations and to attorneys fees as accorded by law.

## 6th COA: BACKWARDS ACCESS CLAIM UNDER THE FEDERAL CIVIL RIGHTS STATUTE AND BIVENS CONSTITIONAL TORTS

---

53. In **Becher v. Feller, 2008 NY Slip Op 51060(U)(2008 NY Slip Op 51060 (N.Y. 2008)**, the New York Supreme Court affirmed that prosecution under the Federal Racketeering Act was proper when 3 members of a criminal enterprise stole real estate and other valuable assets from a private trust by inducing the beneficiary UNGAR to discharge the family's trustee and appoint another trustee who was involved with the conspiracy to steel the trust assets. The members of the enterprise pillaged the trust of its assets and evicted UNGAR's family from their home.

54. In Texas, when government officials falsify reports and conceal exculpitory evidence to cover up crimes committed by others, the government officials are liable under RICO for witness tampering and obstruction of justice. Labarbara v. Angel, 95 F.Supp.2d 656 (E. D. Tex., 2000). In Labarbara supra, plaintiff Labarbara alleged the defendants committed several RICO violations punishable by a term of imprisonment of not more than 20 years. § 12.33 TEX. PEN. CODE when they engaged in a profound scheme of witness tampering to avoid civil liability. Labarbara asserted that the police chief Winder filed a false accident report in violation of 1962(a), (b) and (d). Specifically, Labarbara's son was killed by the football coach while the coach was driving under the influence. The police in charge of the investigation and under Winder's control, immediately engaged in a cover up by not interviewing critical witnesses, failing to record relevant physical evidence, conspiring with the Doctor at the hospital to cancel Coach Pearce's blood-alcohol tests in violation of emergency room protocols and Police Department policy, and subsequently filing a false accident report indicating that LaBarbara was at fault for the accident, that Pearce took evasive action with his vehicle & that a false witness observed the event.

52. Plaintiffs allege that the defendants did conspire one with another to destroy evidence, to fabricate false process and to incarcerate HOLLI based on false crimes; all in order to defeat plaintiff's access to the courts.

53. As the record herein shows, plaintiffs had meritorious claims which were corruptly disposed by the illicit use of the office of the courts. Moreover in every instance actually biased courts prohibited from sitting on plaintiffs cases administered over the cases in violation of the Constitution. 55

54. Based on the foregoing, plaintiffs cases were disposed in a manner not according to law and plaintiffs have therefore stated a backwards access claim on the Idaho and Utah cases obstructed by the defendants.

## 7th COA: BILL OF REVIEW UNDER TEXAS' UEFJA

55. Plaintiffs hereby register the void contempt judgments herein

---

55. See ***United States v. Will,* 449 U.S. 200, 217, 101 S.Ct. 471, 481, 66 L.Ed.2d 392 (1980)** (forum **must** provide a judge having no interest in the litigation to avoid statutory violations under the disqualification statute); Republican Party of Minn. v. White, case no. 99-404 (8th Cir. 2005) (Criminal civil rights violation when judge has a pecuniary interest at stake in the litigation and continues to preside over the case following Tumey v. Ohio, 273 US 510, 523 (1927)); Chase Manhatten Bank v. Affiliation F.M. Ins. Co., 343 F.3d 120, 128 (2nd Cir. 2003) (judge required to recuse because he owned $250,000 stock interests in Chase Manhatten Bank, though ignorant of the holding at the time he ruled). U.S. v. Filani, 74 F.3d 378, 387 (2nd Cir. 1996)(Due process violation when judge acts as advocate for the prosecution.). Litigants ought not to have to face a judge where there is a reasonable question of impartiality. *Id.* (quoting S.Rep. No. 93-419, at 5 (1973); H.R.Rep. No. 93- 1453 (1974), *reprinted* 1974 USC C.A.N. 6351, 6355)); See also Khulumani v. Barclay Nat. Bank Ltd, 504 F.3d 254 (2nd Cir. 2007) (Supreme Court in August 2008 recused off of an Apartheid case because 5 justices owned stock interests in the corporate defendants in the case.); *United States v. Will,* 449 U.S. 200, 217, 101 S.Ct. 471, 481, 66 L.Ed.2d 392 (1980) (forum must provide a judge having no interest in the litigation to avoid the statutory disqualification statute); Accord In re US, 158 F.3d 26, 30-31 (1st Cir. 1998); Oses v. Mass, 961 F.2d 985, 986-87 (1st Cir. 1992) (defendants right to due process was violated when the judge commented sarcastically about a party's case and failed to curb misconduct of the opposing party.); US v. B.H. Dist. Corp., 375 F.Supp. 136 (1974) ("pecuniary interest in a party violates the disqualification statute, violated the Constitution and renders the prosecution void".)

Texas's UEFJA for attack under Bills of Review. Under the UEFJA, a copy of a foreign judgment may be filed in a court of the state, and the judgment will thereafter be treated as a judgment of a court of the registration state. Unif. Enforcement of Foreign Judgments Act § 1-10 (West 2007). Tex. Civ. Prac. & Rem. Code 936.00. 56

54. After filing, the judgment is subject to enforcement or attack in a bill of review. In Texas, a judgment is void when the rendering court "had no jurisdiction of the parties, no jurisdiction of the subject matter, no jurisdiction to enter the judgment or no capacity to act as a court."

## 8th COA: MALICIOUS PROSECUTION AGAINST ALL DEFENDANTS EXCEPT HOLDER, THE JUDICIAL DEFENDANTS, BOP CUSTODIAL AGENT AND THE IDOT AND UDOT DEFENDANTS

55. In **Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 517 (Tex.1997),** Texas held the elements to a malicious prosecution claim to be: (a) a criminal prosecution was commenced against the plaintiff; (b) the defendant initiated or procured that prosecution; [267 S.W.3d 528]; (c) the prosecution terminated in the plaintiff's favor under circumstances that implied the plaintiffs innocence; (d) the

---

See also U.S. v. Grubb, 11 F.3d 426 (C.A.4 (W.Va.), 1993) (Judge Grubb was convicted of bribery, mail fraud; conspiracy to commit fraud; tampering with a witness; obstruction of justice, and operating his judicial office as a racketeering enterprise. Affirmed.) See **Ex Parte Secombe, 60 U.S. (19 How.) 9, 13, 15 L.Ed. 565 (1856)**: It is well settled, by the rules and practice of common-law courts, that it rests exclusively with the court to determine for what cause an attorney ought to be removed based on acts committed before the court which impugn the integrity of the court's process. McManus v. Wallis, 52 Tex. 534, 547 (1880) citing Brummett v. Gamble, 946 F.2d 1178 (C.A.5 (Tex.), 1991) (where the defendants had absolutely no evidence to support a charge and nevertheless conspired to pursue a criminal prosecution in bad faith and without probable cause, the defendants are liable to plaintiff.

. 56. See Browning v. Placke, 698 S.W.2d 362,363 (Tex. **1985)**; ***see In re Altman Nursing*, 299 B.R. 813, 820 (Bankr. N.D. Tex. 2003).** A "bill of review" action is Texas's method for attacking an otherwise final judgment on the merits." *See McEwen v. Harrison*, 345 S.W.2d 706, 709-10 (Tex. 1961); *Nguyen v. Intertex*, 93 S.W.3d 288, 294 (Tex. App. 2002) (A bill of review is an independent equitable suit to reopen a judgment that is no longer appealable due to some fraud of the procuring party. ) Other courts have heard "Bill of the Review" cases in tandem with another cause of action: Abuse of Process. See also (**Tex. Civ. App.) 193 S. W. 363**, it was held that the statutory requirements regarding citations and service thereof must be strictly followed to acquire jurisdiction.)

defendant lacked probable cause to initiate the prosecution; (e) the defendant acted with malice; and (f) plaintiff suffered damages. 57

56. In 2006, TALLMAN usurped his jurisdiction by conducting criminal proceedings against HOLLI without according HOLLI criminal procedural due process. Attorneys representing the various fortune 500 companies HOLLI had sued, charged HOLLI on behalf of their clients with various forgery and service fraud crimes to procure a guilty verdict against HOLLI and to avoid liability to HOLLI for their many torts committed against HOLLI. On May 15, 2006, Judge TALLMAN conducted a criminal contempt hearing to determine the validity of the criminal charges asserted by the torts defendant's attorneys. At and after the hearing HOLLI complained that TALLMAN usurped his authority by failing to charge HOLLI by indictment, by acting as the prosecutor instead of appointing a prosecutor, by failing to accord HOLLI an impartial tribunal, by denying HOLLI her 6th amendment right to confrontation and by failing to convene a jury to try felony charges. Realizing the merit of HOLLI's argument, Judge TALLMAN converted cloaked his criminal contempt judgment into a civil contempt judgment and accused HOLLI of being a criminal abusive litigant. TALLMAN also barred any litigant equally situated with HOLLI from ever appearing in a court in the 9th circuit to prosecute a claim. When HOLLI appealed TALLMAN's criminal contempt judgment and the $500 fine TALLMAN ordered HOLLI to pay, TALLMAN helped orchestrate HOLLI's next criminal prosecution in Utah complaining that HOLLI had used forged notaries on declarations which she had filed in the Idaho federal court.

57. Defendant EDWARD assisted the complaining witnesses and TALLMAN in bringing about criminal charges against HOLLI knowing there was no evidence that HOLLI committed any crime and that the tort defendant's attorneys had

---

58. **Castellano v. Fragozo, 2002 C05 517 (USCA5, 2002)** ("The elements of damage in cases of malicious prosecution are physical injury, injury to feelings and reputation, injury to property, loss of time, and expenses".) **Equitable Life Assurance Soc'y of the U.S. v. Lester, 110 S.W. 499, 502 (Tex. Civ. App. 1908)** ("A suit for malicious prosecution so far partakes of the nature of a criminal proceeding as to admit to the recovery of exemplary damages".) McManus v. Wallis, 52 Tex. 534, 547 (1880).

charged Holli with crimes to avoid liability. All of the elements for malicious prosecution were met.

**a) A criminal Prosecution Was Commenced Against Holli By The Named Complaining Witnesses and Their Charges Were Memorialized By TALLMAN and The 2007 Indictment**

58. There is no dispute that the accused defendants procured HOLLI's criminal prosecutions both before TALLMAN's court in Idaho and in the Utah District Court. 59

**b) The Prosecution Terminated In Telford's Favor**

59. The 2007 prosecution terminated in HOLLI's favor in 2009. Holli was obstructed from her appeal re the void prosecution before TALLMAN's court because HOLLI was arrested before she could address the appeal and by the time Holli was released on the 2007 charges in 2009, the 9th circuit dismissed HOLLI's appeal for lack of prosecution and refused to reinstate the appeal. Neverthelss, a determination that TALLMAN's proceedings were void would meet the element that TALLMAN's prosecution terminated in HOLLI's favor. 60

---

59. A defendant procures a prosecution when the defendant provides information which he knows is false and which results in a grand jury indictment. See Torres v. Gsc Enterprises, Inc., 242 S.W.3d 553 (Tex. App., 2007). King v. Graham, 126 S.W.3d 75, 76 (Tex.2003); Browning-Ferris Industries, Inc. v. Lieck, 881 S.W.2d 288, 293 (Tex.1994); Jones v. Schein, 103 N.E. 57, 58 (Mass. 1913); and Tangney, 39 N.E. at 800. A defendant is liable for malicious prosecution if he took some active part in instigating or encouraging the prosecution. W.P. Keeton, Prosser & Keeton on the Law of Torts Sec. 119 (5th ed. 1984) (citing Wood v. Palmer Ford, Inc., 47 Md. App. 692, 425 A.2d 671 (1981)); Schleicher v. Western State Bank, 314 N.W.2d 293 (N.D.1982).

60. In Fulton v. Robinson, 289 F.3d 188 (2nd Cir., 2002) the federal circuit court opined that "Actual innocence is not required for a common law favorable termination." Restatement of the Law of Torts § 659 (1938). Dismissal of charges on double jeopardy grounds is a common law favorable termination." Id. @ § 660 (1938). Smith v. Holtz, 87 F.3d 108, 113 (3d Cir.), cert. Denied, 519 U.S. 1041, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996); North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) ( Dismissal on double jeopardy grounds is a vindication of a fundamental right under the Constitution and therefore constitutes a favorable termination); Grider v. City of Auburn, 628 F. Supp. 2d 1322 (M.D. Ala., 2009) (proceedings are terminated in the plaintiff's favor when an entry of a nolle prosequi has occurred in a criminal case.) Accord in Uboh v. Reno, 141 F.3d 1000, 1005 (11th Cir.1998); Bryson v. Macy, 611 F.Supp.2d 1234 (W.D. Okla., 2009) ("Criminal proceedings

### c) Probable Cause Was Not Established Because The Intermediaries Were Defrauded

60. Frauds were committed upon both Tallman's Court and the Grand Jury issuing the 2007 indictment. In both of these situations, these bodies were the intermediaries determining probable cause. In Tallmans' case, HOLLI was also deprived of an impartial tribunal. In Deville v. Marcantel, 567 F.3d 156 (5th. Cir., 2009), the 5th Circuit quoted the Independent Intermediary Rule: "if facts supporting an arrest are placed before an independent intermediary, the intermediary's decision insulates the initiating party unless the facts are false. 61

---

are terminated in favor of the accused by the formal abandonment of the proceedings by the public prosecutor.'"); Wilkins, 528 F.3d at 802 (quoting Restatement (Second) of Torts § 659(c)(1977) ("[T]he inability of a prosecutor to prove a case beyond a reasonable doubt at trial is consistent with the innocence of the accused and is deemed a favorable termination in favor of the accused." Id. ); Calleja v. Wiley, 290 So.2d 123 (Fla. 2d DCA 1974)(There is no specific requirement that a criminal prosecution be terminated in a particular way. See 52 Am.Jur.2d Malicious Prosecution § 34. The action for malicious prosecution does not depend on some specific event, because termination may be evidenced in a variety of ways . . . ." Calleja v. Wiley, supra, at 125. Prosser, Torts § 119 (4th ed. 1977) at 839 ("It will be enough that the proceeding is terminated in such a manner that it cannot be revived, and the prosecutor, if he proceeds further, will be put to a new one. A favorable termination also occurs when: (a) a grand jury fails to indict resulting in discharge of the criminal charges; (b) an indictment is quashed; (c) a prosecutor enters a nolle prosequi or a dismissal of a criminal case; (d) a prosecuting attorney abandons the prosecution; or (e) when any act has the effect of ending the particular proceeding and would require new process or other official action to commence a new prosecution."). Vancouver v. Cook, appeal no. 99-3314 (10th Cir. 2001) ("We conclude . . . that a void judgment is an absolute nullity and may be ignored or disregarded, vacated on motion, or attacked on habeas corpus."). With regard to the favorable termination requirement in the prosecution violates due process from the outset, federal treatises hold: Favorable termination met when .... the termination was "such as will support the inference that the underlying proceedings were instituted without probable cause or based on false evidence.). W. Page Keeton et al., Prosser & Keeton on Torts at 894 (5th ed. 1984) ("...if it can be shown that a judgment was obtained by fraud, perjury or other corrupt means, and confirmed by reversal, the favorable termination requirement will be met.). Accord in Vaughan v. Hornaman, 403 P.2d 948, 956 (Kan. 1965). Spencer v. Kemna, 523 US 1 (1997). ; *In re Winship,* 397 U.S. 358, 363-364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970) (" [B]ecause of the certainty that [one found guilty of criminal behavior] would be stigmatized by the conviction . . . , a society that values the good name and freedom of every individual should ... should be secure in the belief that the conviction was validly obtained.)

61. See Murray v. Earle, 405 F.3d 278 (5th Cir. 2005)(quoting Hand v. Gary, 838 F.2d 1420 , 1428 (5th Cir.1988) (...an initiating party is not immuned from

61. In the case at bar, all of the allegations made by the attorneys in Tallman's contempt prosecution were determined by a prosecutor in the 2007 criminal prosecution in Utah to be false; hence the dismissal of the 2007 criminal prosecution in 2009. Furthermore, because the 2007 criminal prosecution never went to trial, the dismissal of the 2007 criminal prosecution occurred at the lower probable cause standard of proof thus deciding the issue of probable cause in HOLLI's favor.

e) **The Defendants Acted With Malice**

62. HOLLI asserts that no competent evidence existed that HOLLI committed any of the crimes for which she was charged. The tort defendant's attorneys filing the charges against HOLLI in TALLMAN'S criminal contempt action knew that their charging statements were false and committed these statements for the sole purpose of avoiding liability to HOLLI for years of tortious conduct. 62 The complaining witnesses false statements met the malice requirement.

63. Moreover, conduct which causes a criminal prosecution to be maintained even though the conduct did not play a role in initiating the process, is actionable. Declarations HOLLI filed in the Idaho federal court initiated the criminal prosecution, and TALLMAN's contempt judgment added additional fuel to the fire to compel the prosecutor to maintain the criminal prosecution for 2 years. The complaining witnesses charges in TALLMAN's court definatively caused the 2007 criminal prosecution to be maintained. 63

---

suit where he tainted the deliberations of the independent intermediary through some act of fraud or omission. Hand, 838 F.2d at 1428.

62. In **New York Times Co. v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)**, the Supreme Court held that "malice is found if a statement that was known to be false or was made with reckless disregard for the truth, was transmitted and caused damages to the plaintiff ). When there is no competent evidence whatever in support of a true bill charging the plaintiff with crimes, then a criminal prosecution based on the false bill is taken with malice. 31 C. J. 808; Grace v. United States 4 F.2d 658 (4th Cir. 1918).

63. In State v. Rogovich, 188 Ariz. 38, 932 P.2d 794 (Ariz., 1997), the Court affirmed the principle that one who engages in reckless conduct that is actively instrumental in causing legal proceedings to be improperly maintained even if that conduct played no role in the initiation of the legal proceedings, is liable under section 1983. **Albright v. Oliver, 510 U.S. 266, 280, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)); Bigford v. Taylor, 834 F.2d 1213, 1218 (5th Cir.1988)** ("Police may not disregard facts tending to dissipate probable cause and

### f) HOLLI Was Damaged By The Defendants Actions

64. HOLLI has been profoundly damaged by the defendant's actions which contributed to the total devastation and loss of HOLLI's very profitable self made businesses. When HOLLI was locked up, she had no one to sustain her businesses which collapsed. Moreover, TALLMAN'S order caused tremendous damage to HOLLI and MARTI's reputations both in business and personally. Finally, HOLLI was physically tortured and injured while incarcerated and is entitled to incarceration damages from these defendants.

65. Based on the foregoing, HOLLI is entitled to a malicious prosecution claim against the complaining witnesses.

### 9th COA: TORTIOUS INTERFERENCE WITH CONTRACT AND ECONOMIC ADVANTAGE AGAINST ALL DEFENDANTS EXCEPT THE USA, THE JUDICIAL DEFENDANTS, AND THE BOP CUSTODIAN

66. In **Rodarte v. Investeco Group, L.L.C., No. 14-08-00093-CV (Tex. App. 9/29/2009) (Tex. App., 2009)** (To prevail on a claim for tortious interference with contract or with prospective business relations, plaintiff must establish, among other things, that the claimed interference was "unlawful" or "improper."). See also **Bank One, Texas, N.A. v. Stewart, 967 S.W.2d 419 (Tex.App.-Hous. (14 Dist.), 1998)** (A knowing and intentional breach of one's contract is an act of tortious interference if the breach has the purpose and effect of preventing a third party from performing its contract with another.") Accord, **American Nat'l Petroleum Co. v Transcontinental Gas Pipe Line Corp., 798 S.W.2d 274, 279 (Tex.1990).** In **B. Inc. v. Miller Brewing Co. 663 F.2d 545, 553 (5th Cir. 1981)** ("if an agent is "motivated by personal animus

---

thereby continue a criminal prosecution against an accused"); Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir.1999) ("[B]ecause the totality of the circumstances determines the existence of probable cause, evidence that tends to negate the possibility that a suspect has committed a crime is relevant and must be presented once obtained). **See also Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)** (A subsequent tort jury is entitled to determine whether the withholding of exculpitory evidence to a grand jury would have negated the probable cause determination made by the grand jury and nullified the continuation of criminal proceedings against the plaintiff.)

or greed in extracting contract concessions or breaches, then under Texas law, the agent can indeed be held liable for inducing his principal to breach a contract.")

67. HOLLI alleges that the complaining witnesses in HOLLI's criminal and civil contempt proceedings interfered with HOLLI's right to engage in commerce, to commit to contracts, to enforce contracts and to seek prospective economic advantages. The very nature of the cases pending in the Idaho federal courts had to do with commercial land contracts executed for the purpose of developing and operating commercial businesses. The Complaining witnesses knew about HOLLI's contracts and deliberately interferred with these contracts and HOLLI's prospective economic advantages through unlawful means.

68. The UDOT defendants are liable to MARTI and CINDY for interfering with their rights to enforce their contracts which attached to their properties. Also, the UDOT defendants interfered with Marti's ability to complete a residential structure on her Utah property, interfered with MARTI's ability to enforce the contracts with American Fork City and interfered with MARTI's ability to operate a home business out of her home.

69. Finally, the UDOT defendants interfered with Cindy's ability to enjoy the full amount of her security interest.

70. Based on the foregoing, the defendants are liable to plaintiffs for interference with contract and prospective economic advantages.

## 10th COA: BAD FAITH BREACH OF CONTRACTS AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST AMERICAN FORK, THOMPSON, HADFIELD, UDOT, CLARK, LYON, MCDONOUGH, PACIFICORP and MIDAMERICA

71. MARTI purchased a 1/10 acre of property bordering the I-15 freeway to build a residence. The real property carried excellent freeway visibility for MARTI's in-home business. Residential and commercial properties bordered the freeway where MARTI acquired her property. MARTI also obtained a waiver from the neighbor south of MARTI to waive any acquisition interest in the vacant road which bordered MARTI's property so that MARTI could expand the size of her deeded property to 1/3 of an acre.